UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| JEFFREY SMITH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:19-cv-30145-MGM |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Defendants. | ) |

---

## THE UNITED STATES' MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiffs Jeffrey Smith and Kerry Smith, as parent and next friend to her children C.S. and

A.S., sued the United States under the Federal Tort Claims Act ("FTCA") for injuries Jeffrey Smith

sustained when he crashed his snowmobile into a shut-down helicopter operated by the United

States Army on March 12, 2019. The sole issue on summary judgment is whether the discretionary

function exception to the FTCA deprives the Court of jurisdiction over Plaintiffs' claims. Because

it does, the Court should grant summary judgment in favor of the United States on all claims

against it in the Second Amended Complaint (ECF No. 32).

Plaintiffs' only remaining claim in this litigation concerns whether the United States is

liable for not illuminating or otherwise warning about the shut-down helicopter. But the Army's

decision not to illuminate or warn about the helicopter satisfies the two-part test for applying the

discretionary function exception because the Army's decision (1) "involve[d] an element of

judgment or choice," and (2) "was susceptible to policy-related analysis." *See Sanchez ex rel.

D.R.S. v. United States*, 671 F.3d 86, 93 (1st Cir. 2012) (internal quotations omitted). First, this

Court already has decided that the Army crew's decision was discretionary. Electronic Order

(Mar. 31, 2021), ECF No. 44.  And, even if it had not, Plaintiffs cannot establish that the Army's decision was non-discretionary.

As to whether the conduct was susceptible to policy analysis, courts generally "avoid interfering with the exercise of discretionary military authority," *Abreu v. United States*, 468 F.3d 20, 28 (1st Cir. 2006), and this case should be no different.  The Army crew's decision regarding illumination or warning was susceptible to weighing military and safety concerns including, at least, the orderly conduct of Army training, risk to an Army helicopter, the safety of the Army helicopter crew, and the safety of civilians (both at the airfield and beyond).  *See Shansky v. United States*, 164 F.3d 688, 695 (1st Cir. 1999) (holding that the discretionary function exception applies to government decisions that involve "the unrestrained balancing of incommensurable values").

Illuminating or warning about a parked Army Blackhawk medevac helicopter is fraught with idiosyncratic peril unlike, for example, illuminating the hazard lights on one's car.  There are, of course, no hazard lights on a Blackhawk medevac helicopter, and the conduct of military training—along with the safety of the helicopter, its crew, and nearby civilians—depends on the highly-trained military crew's precise operation of the aircraft.  Powering a parked Blackhawk medevac helicopter to illuminate its exterior lights risks fire, fuel leaks, and hazardous noise, all of which can endanger the helicopter or its crew and any nearby civilians.  Fire damage to the helicopter also could thwart an Army training mission, thereby inhibiting the Army's core function of assuring military preparedness.  Likewise, powering a parked helicopter to operate its lights risks depleting the helicopter's energy sources that may be critical to continuing an Army mission, not to mention the safety of the helicopter and crew during any subsequent flight.

Moreover, were the crew to veer from standard practice by affixing supplementary lights to a parked Blackhawk medevac helicopter, the crew would risk unintentionally neglecting to remove the lights pre-flight, which could result in foreign object damage ("FOD") to the helicopter, or materials falling from the helicopter and injuring those below. Similarly, traveling with cones or other markings, which a helicopter of this type ordinarily does not do, would risk such items becoming loose during flight and causing FOD or civilian injury.

Therefore, the undisputed facts establish that no directive mandated a specific course of action here, and that the Army's decision to illuminate or warn about the shut-down helicopter was subject to weighing several competing policy concerns. Thus, the discretionary function exception applies even if the Army crew ultimately misjudged the competing risks in not illuminating or warning about the helicopter. *See Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021), *cert. denied* 142 S. Ct. 715 (2021). (holding that the negligence of the government is irrelevant to determining whether the discretionary function exception applies). Accordingly, the Court should enter summary judgment in favor of the United States.

## I.    BACKGROUND

### A.    Procedural Posture

This Court already has ruled that Plaintiffs' only theory of liability against the United States that could proceed to discovery was that the Army allegedly failed to illuminate, or otherwise warn about, the shut-down helicopter. Electronic Order (Mar. 31, 2021), ECF No. 44. In resolving the United States' motion to dismiss, the Court first identified two "separate" theories of liability "that allegedly caused the harm: (1) the decision to land the helicopter and train at the Albert Farms Airfield; and (2) the decision to leave the helicopter unilluminated and otherwise failing to warn snowmobilers using the trail as to the presence of the camouflaged helicopter." *Id*. The Court held that the first theory, which challenged the decision to land and

train at the airfield, was "protected by the discretionary function exception[.]" *Id.* The Court also ruled that the decision not to illuminate or otherwise warn about the helicopter was discretionary, thereby satisfying the first prong of the discretionary function exception test. *Id.* However, based on the "preliminary record" and "viewing the facts and inferences in the light most favorable to Plaintiff," the Court could not conclude at the "early stage of the litigation" that the second theory of liability—*i.e.*, the alleged failure to illuminate or warn about the helicopter—was susceptible to policy analysis. *Id.*

Now that discovery is complete, the only issue remaining on summary judgment is whether the discretionary function exception precludes liability for the Army's alleged failure to illuminate, or otherwise warn about, the shut-down helicopter.

## B. Facts

### 1. Facts Relevant to the Accident

On March 12, 2019, an Army helicopter crew stationed at Fort Drum, New York, and led by Chief Warrant Officer ("CW4") Benjamin Foster, landed a Blackhawk medevac Army helicopter at Albert Farms Airfield in Worthington, Massachusetts during a training mission. Local R. 56.1 Statement of Undisputed Material Facts in Supp. of Def. United States' Mot. for Summ. J. (Apr. 5, 2022), ¶¶ 1-3 ("DSOF"). CW4 Foster selected the Albert Farms Airfield to conduct a Pilot-in-Command training because it was an unlit, unimproved airfield that CW4 Foster believed would offer realistic training. *Id.* ¶ 8.

In advance of the mission, CW4 Foster received permission from Defendant Donald Chase, who owned the Albert Farms Airfield, to land the helicopter anywhere at Albert Farms for purposes of training. *Id.* ¶¶ 9-10. However, Mr. Chase did not tell CW4 Foster that Mr. Chase previously had given permission to the Worthington Snowmobile Club ("WSC") to use

the Albert Farms Airfield for snowmobiling. *Id.* ¶¶ 11, 13-14. More particularly, Mr. Chase knew—but did not tell CW4 Foster—that there was a snowmobile trail located on the runway at the Albert Farms Airfield. *Id.* ¶¶ 12, 14. Nor did Mr. Chase notify the WSC that he had given CW4 Foster permission to land a helicopter where snowmobiles were permitted to operate at Albert Farms. *Id.* ¶ 15.

The Army crew's training mission was, among other things, a Pilot-in-Command evaluation that would span multiple modes of flight, including night unaided and night vision goggles modes of flight. *Id.* ¶¶ 5-6. To that end, the crew landed the helicopter at Albert Farms Airfield in the afternoon or early evening of March 12, 2019, shut down the helicopter, and waited for sunset to continue the Pilot-in-Command training under night modes of flight. *Id.* ¶¶ 16, 19, 21. The helicopter was not illuminated or otherwise marked while it was shut down on Albert Farms Airfield. *Id.* ¶ 20. The helicopter landed and shut down on the runway, which was covered with snow. *Id.* ¶ 17. The snow on the runway was hard-packed and icy. *Id.* ¶ 18.

While the helicopter was shut-down as the crew waited for sunset to continue training, the crew met with James Bowles, a friend of CW4 Foster who lived in Worthington, and Mr. Bowles' family. *Id.* ¶ 22. The crew showed parts of the helicopter to Mr. Bowles, his six children, and other passersby, in what amounted to an informal public relations exercise for the Army. *Id.* ¶¶ 22-23.

While the helicopter was shut-down at Albert Farms Airfield, several snowmobiles approached the helicopter at low speeds. *Id.* ¶ 24. Given that these snowmobiles approached the helicopter with apparent caution, at least one Army crew member did not view it as hazardous to leave the helicopter parked with snowmobiles in the area. *Id.* ¶ 25. Moreover, at all times before

the accident that is the subject of this litigation, no member of the crew knew that there was a snowmobile trail on the Albert Farms Airfield. *Id.* ¶ 31.

Around 7:30 p.m., Plaintiff Jeffrey Smith pressed the throttle on his snowmobile all the way down for 2-5 seconds and drove his snowmobile approximately 65 miles-per-hour into the right rear stabilator of the helicopter. *Id.* ¶¶ 27-28. The Plaintiff had drunk one beer at dinner, and another after dinner, before the accident. *Id.* ¶ 26. He also had taken prescription medication that day. *Id.* The Army crew immediately administered emergency care to Plaintiff while they waited for emergency medical personnel to arrive. *Id.* ¶ 30.

At the time of the accident, the helicopter remained shut-down; the crew had been preparing to take off for the night stage of training, but had not yet turned on the helicopter to do so. *Id.* ¶ 26. Accordingly, civilians (including Mr. Bowles, his wife, and six children) were still standing to the left of the helicopter (from the pilot's perspective) near the helicopter's tail at the time of the accident. *Id.* ¶ 29.

## 2. Facts Relevant to the Discretionary Function Exception

There are no regulations or policies requiring illumination of a non-operating helicopter or that warnings be placed near a non-operating helicopter. *Id.* ¶ 32. Nor were there any such regulations or policies in effect on March 12, 2019. *Id.* Nevertheless, there were certain mechanisms available to the Army crew to illuminate or otherwise warn about the helicopter parked at Albert Farms Airfield. *Id.* ¶¶ 34-35, 39-44, 51-52, 55. However, none of these methods of illuminating or warning about the helicopter were standard Army procedure, and each carried risks to the helicopter, the efficient conduct of military operations, the safety of the crew, or the safety of civilians. *Id.* ¶¶ 36-39, 45-49, 52-55.

The helicopter's batteries could have powered two lights: the cockpit floodlight and the infrared searchlight. *Id.* ¶¶ 34-35. The cockpit floodlight is the only internal light on the

Blackhawk medevac helicopter that could have run off the helicopter's battery power. *Id*. ¶ 34.

The cockpit floodlight shines a blue light toward the helicopter's instrument panel and emits a

blue glow that would be visible to those outside the helicopter that could see the cockpit. *Id*.

¶ 34. On the other hand, the infrared searchlight is the only external light on the Blackhawk

medevac helicopter that could run off the helicopter's battery power. *Id*. ¶ 35. However, the

infrared search light is invisible to the human eye. *Id*. ¶ 35.

Operating one or both of the cockpit floodlight and infrared searchlight would risk

draining the helicopter's battery. *Id*. ¶ 36. Once the helicopter's battery was turned on, it would

have provided power to the battery utility bus, which powers the helicopter's essential

equipment, namely the infrared search light, cockpit floodlight, radio, flight management

systems, and emergency management systems. *Id*. However, the battery utility bus could power

the helicopter's essential equipment for only 15 minutes (and for only 12 minutes if the infrared

searchlight were turned on). *Id*. After that period, the battery would have insufficient power to

start the helicopter's main engines, meaning the helicopter could not take off. *Id*. ¶¶ 36-37.

Even if a depleted battery were able to start the helicopter, the depleted battery might not be

sufficient to activate the systems necessary to effectuate a safe landing in the event of a dual-

generator failure in the air. *Id*. ¶ 38.

Illuminating the remainder of the helicopter's external lights while the helicopter was

parked would have required starting the helicopter's auxiliary power unit ("APU"), which is a

turbine engine that generates power for the helicopter without its two main engines running. *Id*.

¶¶ 38-40. The APU powers all the lights on the helicopter's exterior that also could be powered

by the helicopter's main engines, namely the anti-collision lights, position lights, landing light,

and formation lights. *Id*. ¶ 40. The anti-collision lights are located both atop the helicopter's tail

and beneath the helicopter toward the back of the aircraft; the position lights are located on the tail and on opposite sides of the helicopter; the landing light is located on the nose of the helicopter beneath the windshield; and the formation lights are located atop the fuselage as well as on the outboard ends of the rear stabilator. *Id*. ¶¶ 41-44.

However, turning on the APU to provide electricity to these external lights would risk an APU fire, electrical fire, or fuel system leak, each of which could endanger the crew, helicopter, and any civilians nearby. *Id*. ¶ 45. A fire (including a fire started by a fuel leak) also could render the helicopter inoperable, leaving the Army crew grounded and unable to continue its mission. *Id*. Furthermore, due to the risk of fire, among other emergencies, Army policy requires that an Army pilot sit in the helicopter's cockpit whenever the APU is running, meaning that a pilot who might otherwise be able to take a break while the helicopter was parked would need to remain at the ready. *Id*. ¶ 46. This could cause pilot stress and fatigue that might otherwise be avoided. *Id*. Incurring such stress or fatigue before a nighttime training mission is particularly concerning because nighttime training requires a pilot's increased attentiveness. *Id*. A pilot's fatigue may cause error, which could endanger the helicopter and its crew. *Id*.

Moreover, the APU is dangerously loud, such that anyone within 100 feet of the helicopter while the APU is running must wear hearing protection or risk hearing damage. *Id*. ¶ 47. Even those beyond 100 feet from the helicopter for an extended time could suffer hearing loss from the APU if they do not protect their ears. *Id*. Additionally, the APU is louder for those positioned on the left side of the helicopter (from the perspective of the pilot) due to the placement of the helicopter's exhaust system. *Id*.

Running the APU while a Blackhawk medevac helicopter is parked also drains fuel from the helicopter's number one fuel cell. *Id*. ¶ 48. The helicopter has two fuel cells, each of which

provides fuel to one of the helicopter's two main engines. *Id.* This design acts as a safety mechanism in case one fuel cell is compromised because the other fuel cell still could provide fuel to one of the helicopter's engines. *Id.* Running the APU off the number one fuel cell while the helicopter is parked, however, would create a weight imbalance between the two fuel cells, requiring the pilot of the subsequent flight to counteract that imbalance during the flight by running both engines off the number two fuel cell. *Id.* ¶ 49. Doing so would undermine the helicopter's built-in safety mechanism of using a separate fuel cell for each of the two engines. *Id.* ¶ 49.

Aside from illuminating the helicopter's exterior lights, the Army crew could have affixed chem lights to the outside of the helicopter, although it is not ordinary Army practice to do. *Id.* ¶¶ 51-52. Chem lights function like glow sticks. *Id.* ¶ 51. Army personnel are trained to use chem lights only to mark a downed aircraft. *Id.* Affixing them to the outside of the helicopter, however, risks the crew neglecting to remove them before flight. *Id.* ¶ 53. The risk that the crew might inadvertently leave a chem light on the helicopter at take-off is magnified because it would be necessary to affix several chem lights to warn passersby approaching from different angles, and the lack of standard locations on the helicopter at which to affix chem lights would increase the likelihood that the crew would not spot one prior to take off (particularly if a chem light had burned out or dimmed). *Id.* ¶ 54.

If the crew inadvertently neglected to remove a chem light before take-off, the chem light could come loose during flight and cause FOD to the helicopter, including damage to the rotor or engines. *Id.* ¶ 53. Any such damage to the helicopter also would risk the safety of the crew. *Id.* Likewise, a loose chem light could fall from the helicopter and injure people or property below. *Id.*

A Blackhawk medevac helicopter does not carry any additional materials for marking the helicopter, such as cones or flares. *Id.* ¶ 55. Moreover, carrying any such markers would risk them coming loose during flight and, like a dislodged chem light, causing FOD to the helicopter, danger to the crew, and injury to people and things below. *Id.* ¶ 55.

## II. LEGAL LANDSCAPE

### A. The Discretionary Function Exception to the FTCA's Limited Waiver of Sovereign Immunity

The discretionary function exception to the FTCA maintains the United States' sovereign immunity as to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If a claim falls within the FTCA's discretionary function exception, it is outside of the FTCA's limited waiver of immunity, and the court must dismiss the action for lack of subject matter jurisdiction. *See Abreu*, 468 F.3d at 25. Courts are obligated to construe "waivers [of sovereign immunity] narrowly and to resolve any ambiguity or uncertainty in favor of immunity." *Abreu*, 468 F.3d at 30 (citing *United States v. Williams*, 514 U.S. 527, 531 (1995)).

The "party asserting federal jurisdiction" under the FTCA "bear[s] the burden of establishing its existence." *See Reyes-Colón v. United States*, 974 F.3d 56, 60 (1st Cir. 2020). As part of establishing that jurisdiction lies under the FTCA, Plaintiffs bear the burden of establishing that the discretionary function exception does not apply. *See Reyes-Colón*, 974 F.3d at 60-62 (holding that the discretionary function exception applied where plaintiffs failed to establish that defendant's alleged misconduct was non-discretionary under the first part of the discretionary function exception's two-part test); *Bolduc v. United States*, 402 F.3d 50, 60 (1st Cir. 2005) (holding that plaintiff bears "the devoir of persuasion" on the second part of the

discretionary function exception's two-part test); *see also, e.g.*, *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (finding that the burden of proof concerning the discretionary function exception lies with the plaintiff).[1]

## B.    The Discretionary Function Exception's Two-Part Test

As this Court recognized in its order granting in part the United States' motion to dismiss, the Supreme Court has established a two-part test to determine whether the discretionary function exception applies.  Electronic Order (Mar. 31, 2021), ECF No. 44.  "'[T]he discretionary function exception applies if the conduct underlying an FTCA claim both (1) involves an element of judgment or choice, and (2) was susceptible to policy-related analysis,' whether or not the actual conduct was 'the end product of policy-driven analysis.'"  *Id*. (quoting *Sanchez*, 671 F.3d at 93) (alteration in original).

As to the first part of the test, therefore, the allegedly negligent act or failure to act must *not* have violated a statute, regulation, or policy that prescribed a *specific course of action* for a government employee to follow.  *See United States v. Gaubert*, 499 U.S. 315, 322 (1991).

Second, assuming that the government employee had discretion, the discretionary function exception applies if the challenged conduct was "susceptible to policy analysis" involving "social, economic, and political" policy considerations.  *Gaubert*, 499 U.S. at 322-23, 325; *see also Abreu*, 468 F.3d at 25-26.  However, it matters not whether the employee actually conducted a policy

---

[1] *See also Wood v. United States*, 290 F.3d 29, 37 (1st Cir. 2002) (stating that "[b]ecause the law presumes that the exercise of official discretion implicates policy judgments," the plaintiff "bears the burden . . . of demonstrating that the [government's] conduct was not at least susceptible to policy related judgments"); *Irving v. United States*, 162 F.3d 154, 168 (1st Cir. 1998) (en banc) (stating that because there is a presumption that discretionary governmental conduct is grounded in policy, the government has no burden of production to show policy).

analysis as part of the challenged action or inaction. *Gaubert*, 499 U.S. at 325. "Nor does it matter, for purposes of the discretionary function exception, whether [the government's] conduct was ultimately negligent[.]" *Davallou*, 998 F.3d at 505. In other words, the inquiry is "whether the decision is susceptible to policy analysis, not whether such analysis was correctly applied." *See Davallou v. Ancient and Honorable Artillery Co. of Mass.*, No. 18-10822-LTS, 2019 WL 3546665, at *4 (D. Mass. May 23, 2019), *aff'd* 988 F.3d 502 (1st Cir. 2021).

Moreover, when a government employee is acting pursuant to a discretionary statute, regulation, or guideline there is a "strong presumption" that the employee's conduct is grounded in the policies of that provision. *Gaubert*, 499 U.S. at 324. Finally, the discretionary function exception applies alike to "high-level policy making or planning functions" and "day-to-day operational decisions." *Davallou*, 998 F.3d at 505 (citing *Gaubert*, 499 U.S. at 325).

## C. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. ARGUMENT

The discretionary function exception deprives the Court of jurisdiction to adjudicate whether the Army was negligent for failing to illuminate or warn about the shut-down helicopter because (a) no directive mandated that the Army take a specific course of action, and (b) the Army's decision whether to illuminate or warn about the helicopter was susceptible to policy analysis.

## A. No specific, mandatory provision removed discretion from the crew regarding illuminating or warning about the shut-down helicopter

This Court already has held that all of the alleged governmental misconduct in this case—including the alleged failure to illuminate or warn—"'involves an element of judgment or

choice,' in the sense that no 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"  Electronic Order (Mar. 31, 2021), ECF No. 44 (quoting *Sanchez*, 671 F.3d at 93).

Even if this issue were before the Court now, the discovery record has only confirmed the Court's prior ruling.  Plaintiffs cannot point to any statute, regulation, or directive that prescribes a *specific course of action* for the Army to follow as to whether to illuminate or warn about a shut-down helicopter.  Accordingly, Plaintiffs have failed to carry their burden to prove that the alleged misconduct was non-discretionary.  *See Reyes-Colón*, 974 F.3d at 60-62.  Even if the burden were on Defendants to establish that the challenged conduct was discretionary, undisputed facts in the record establish that no statute, regulation, or directive mandated whether to illuminate or warn about a shut-down helicopter.  DSOF ¶ 32.

**B.     The Army crew's decision whether to illuminate or warn about the shut-down helicopter was susceptible to policy analysis**

This Court has recognized that "federal courts are constrained not to interfere with the exercise of [policy-based] discretion by any agency, and that is particularly so in the running of military operations."  Electronic Order (Mar. 31, 2021), ECF No. 44 (quoting *Sanchez*, 671 F.3d at 103) (alteration in original).  As the Supreme Court has made clear, discretionary military decisions that are susceptible to policy considerations include those that require "the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and combat effectiveness."  *Boyle v. United Tech. Corp.*, 487 U.S. 500, 511 (1988); *Minns v. United States*, 155 F.3d 445, 451 (4th Cir. 1998) ("[W]hen discretionary decisions are ones of professional military discretion, they are due the courts' highest deference.").  As a result, "courts have repeatedly refused to allow review of policy-based military decisions in the context of private tort litigation."  *Arnold v. United States*, No. 97-

13

50779, 1998 WL 156318, at *1 (5th Cir. Mar. 18, 1998) (citing *Boyle*, 487 U.S. at 511).  Thus,

failure-to-warn claims, like Plaintiffs' here, are particularly vulnerable to the discretionary

function exception when military exercises and concerns of national defense are at issue.  *See*

*Sanchez*, 671 F.3d at 101-03 (collecting cases).

This case should be no exception.  Plaintiffs have failed to establish that the Army's

decision regarding illuminating or warning about the helicopter was not susceptible to policy

analysis balancing military and safety considerations.  *See Bolduc*, 402 F.3d at 62 (holding that

the discretionary function exception applied where plaintiffs "wholly failed" to "demonstrate that

particular discretionary conduct is not susceptible to policy-related judgments").  To the

contrary, the Army's decision whether to illuminate or warn about the shut-down helicopter

implicated numerous policy considerations including weighing the benefits of illumination or

warning against countervailing risks to the helicopter, the orderly functioning of military

training, and the safety of the crew and civilians.  *Davallou*, 998 F.3d at 505 (affirming the

application of the discretionary function exception where the military's decision on "how to

handle safety considerations . . . implicated a number of competing values").

1.     **Running lights off the helicopter's battery power would deplete the battery, which would threaten the crew's mission and risk imperiling the helicopter and its crew**

The blue cockpit floodlight, which is visible from outside the helicopter, is the only

interior light that could run off the helicopter's battery power.  DSOF ¶ 34.   The helicopter's

battery also could run the exterior infrared searchlight, but the infrared searchlight is invisible to

the human eye.  *Id*. ¶ 35.

Operating either the cockpit floodlight or the infrared searchlight would drain the

helicopter's battery, creating significant risks.  *Id*. ¶ 36.  Draining the battery power would be all

the more likely considering that once the battery is turned on, it automatically runs the helicopter's battery utility bus, which provides power to the helicopter's minimum essential equipment, which is comprised of the cockpit floodlight, infrared searchlight, radio, flight management systems, and emergency management systems. *Id*. The battery provides only a maximum of 15 minutes of power to the battery utility bus, and only 12 minutes of battery power to the battery utility bus if the infrared searchlight is on. *Id*. In other words, after a maximum of 15 minutes with the battery on, the crew could not turn on the helicopter's main engines and take off, which would leave the crew stranded. *Id*. ¶¶ 35-36; s*ee Davallou*, 998 F.3d at 505 (affirming dismissal on discretionary function grounds where government's decision regarding "how to handle safety considerations" at a military event "implicated a number of competing values," including "military training"). Of even greater concern is that a depleted battery might prevent the helicopter from landing safely in the case of a dual-generator failure in any subsequent flight, when battery power would be needed to power an emergency landing. DSOF ¶ 38.

>    2.   **Turning on the helicopter to run the remainder of its external lights would risk fire (and other) damage to the helicopter, interruption of the Army mission, pilot fatigue, and the safety of the crew and nearby civilians**

Illuminating any lights on the exterior of the helicopter visible to the human eye would have required starting the helicopter's APU, a turbine engine which generates power for the helicopter without its main engines operating. *Id*. ¶¶ 38-40. The APU provides power to the helicopter's anti-collision lights, position lights, landing light, and formation lights, each of which is located on the helicopter's exterior. *Id*. ¶ 40-45. However, Army Pilots-in-Command ordinarily would not start the APU until they intend to start the helicopter's main engines, and

starting the APU simply to power the helicopter's external lights risks damage to the helicopter as well as injury to the crew and nearby civilians. *Id.* ¶¶ 39, 45-49.

For example, turning on the APU risks APU fire, electrical fire, or a fuel system leak, each of which could render the helicopter inoperable, forcing the crew to abandon its mission. *Id.* ¶ 45. *See Davallou*, 998 F.3d at 505; *McMullen v. United States*, 950 F. Supp. 1068, 1072 (D. Kan. 1996) (citing "military efficiency" as a valid policy concern underlying a decision protected by the discretionary function exception). Thus, any decision whether to illuminate the helicopter would implicate the core Army function of carrying out training missions to ensure military preparedness. Likewise, a helicopter fire presents obvious danger to the crew and any nearby civilians. *See Sanchez*, 671 F.3d 102-03 (affirming dismissal pursuant to the discretionary function exception where the military's decision implicated safety, among other policy concerns). Accordingly, any crew decision to illuminate the helicopter would have had to balance the safety benefits for passing snowmobiles with dangers to the crew and nearby civilians, as well as risks to the helicopter and the efficient conduct of the Army crew's mission.

The decision whether to illuminate the parked helicopter also would have pitted the safety of passersby against risks to the helicopter and its crew in that operating the APU while the helicopter is parked risks unnecessary pilot stress and fatigue. This is so because Army policy requires that an Army pilot be seated in the helicopter's cockpit whenever the APU is turned on to be in position to respond to any emergency, including fire. *Id.* ¶ 46. Therefore, if the crew had turned on the APU while the helicopter was parked at Albert Farms Airfield, one of the crew's pilots would have had to remain in the cockpit at all times when, otherwise, the pilots could have taken a break. *See id.* ¶ 46. Accordingly, the crew's decision on illuminating the helicopter would have been susceptible to weighing whether the benefits justified imposing

additional stress and fatigue on the pilots, particularly before the nighttime portion of the training

mission, which would require the pilots' heightened attention. *See id*.; *Estabrook v. United*

*States*, No. 16-cv-11772-ADB, 2018 WL 6592092, at *6 (D. Mass. Dec. 13, 2018) (holding that

the discretionary function exception applied where the agency's decision implicated safety,

among other policy considerations).

Turning on the APU to power the helicopter's exterior lights also would risk the safety of

the crew and nearby civilians because the APU is dangerously loud. DSOF ¶ 47. To prevent

hearing damage while the APU is running, hearing protection (such as ear plugs) is required for

those within 100 feet of the helicopter, and those even further from the helicopter risk hearing

damage if they remain in the vicinity for an extended period without hearing protection. *Id*.

Once the helicopter landed and shut-down at Albert Farms Airfield, the crew showed the

helicopter to Chief Foster's friend Mr. Bowles, his family, and other passersby, in what

amounted to an informal public relations exercise for the Army. *Id*. ¶¶ 22-23. For at least part of

that time, Mr. Bowles and his family stood to the left of the helicopter (from the perspective of

the pilot), where the APU sounds louder due to the placement of the helicopter's exhaust. *Id*.

¶¶ 29, 47.

Accordingly, any decision whether to turn on the APU to illuminate the helicopter would

have required comparing the benefits of warning about the helicopter against the potential danger

to the unprotected ears of any civilians in the area. *See Davallou*, 2019 WL 3546665, at *4

(applying the discretionary function exception where a government decision was susceptible to

concerns about "potential harm to third persons," among other policy considerations); *Davallou*,

998 F.3d at 505 (affirming dismissal based on the discretionary function exception where, among

other things, the challenged government decision implicated the "the public's ability to view" an event as well as "the value of the event as a . . . recruitment exercise").

Finally, deciding whether to initiate the APU to illuminate the helicopter would have required weighing the benefits of illumination against the safety risks to the helicopter and crew that come with depleting the helicopter's fuel supply to power the APU. The APU draws fuel from the number one fuel cell, which is one of two fuel cells in the helicopter, each of which powers one of the Blackhawk medevac helicopter's two main engines. DSOF ¶ 48. The design of having two fuel cells operates as a safety mechanism in that, if one fuel cell is compromised, the other fuel cell still can provide fuel to one engine. *Id*. However, operating the APU for a prolonged period while the helicopter is parked would create a weight imbalance between the two fuel cells. *Id*. ¶ 49. In any subsequent flight, the pilot could fix the imbalance by operating both main engines only off the number two fuel cell, but doing so would undermine the safety benefits of operating with two fuel cells in the first place. *Id*. ¶ 49.

### 3. Deciding whether to affix lights to the helicopter's exterior would have required balancing the benefits against considerable risks

If the crew were to affix a chem light to the helicopter while it was parked and inadvertently neglect to remove it before takeoff, the chem light could fly into the helicopter's rotor or get sucked into the intake of one of the helicopter's engines, jeopardizing the mission, helicopter, and safety of the crew. *Id*. ¶ 53. Alternatively, the chem light could fall off the helicopter and injure a person or property below. *Id*. ¶ 53.

The risk of either outcome would have been magnified here because (a) the crew would have had to affix several chem lights to the exterior of the helicopter for them to have been visible from any angle at which a snowmobiler might have approached, and (b) the Blackhawk medevac helicopter has no fixed areas at which to mount chem lights, which would leave the

crew to place them in impromptu spots that might evade detection before take-off (especially if any of the chem lights were to burn out or dim prior to takeoff). *Id*. ¶ 54. Therefore, underlying any decision to affix chem lights to the parked helicopter would have been a balancing of the benefits of illuminating the helicopter with chem lights against the potential harm to the mission, the aircraft, its occupants, and those below its eventual flight path.

> **4.    Blackhawk medevac helicopters do not travel with cones or other materials to mark the presence of the helicopter, and any such markers could come loose during flight and cause damage to the helicopter or civilians**

Blackhawk medevac helicopters ordinarily do not travel with any materials to warn passersby about the helicopter, thus the crew would not have had cones, flares, or other markers with which to warn about the helicopter. *Id*. ¶ 55. Moreover, any decision whether to fly with cones or other markers would have had to balance the benefits of such a warning with the potential that the markers could become dislodged during flight and, like a dislocated chem light, cause damage to the helicopter or those below. *See id*.; *see Boyle*, 487 U.S. at 511 (noting that the military's discretionary function includes balancing combat effectiveness with safety).

> **C.    Any argument that the Army crew's actions were patently unreasonable in light of a specific, known risk is meritless**

Finally, in the time since this Court's decision on the United States' motion to dismiss, the First Circuit has undermined any argument by Plaintiffs that the discretionary function exception should not apply here because the Army crew's failure to warn about the presence of the helicopter was patently unreasonable in the face of a specific, known risk. *See* Pls.' Opp. to Def.'s Mot. to Dismiss Pls.' Second Am. Compl. (May 4, 2020), ECF No. 36, at 11-14. In *Davallou*, the First Circuit rejected such an argument where, as here, it would "place outside the discretionary function exception all instances in which the government knowingly creates a risk of injury without issuing a warning, even if the risk is minimal and a particular type of warning

would undermine competing policy interests." 998 F.3d at 506-07. Here, as explained above, illuminating or warning about the helicopter would have implicated several competing policy concerns.

Moreover, Plaintiffs cannot disprove that at the time of the accident the crew had every reason to view as "minimal" the specific risk that a snowmobiler might, as Plaintiff did, have two beers while on prescription medication then drive approximately 65 miles-per-hour on icy snow at 7:30 at night into the back of the helicopter. *See* DSOF ¶¶ 18, 26-28. It is undisputed that (a) not a single crew member knew that a snowmobile trail crossed the Albert Farms Airfield at the time of the accident; (b) several snowmobiles approached the helicopter before the accident at low speeds; (c) there is no evidence that these snowmobilers approached the helicopter after the sun had set; and (d) at least one member of the crew did not view the helicopter and snowmobiles as a hazardous mix because the snowmobilers were operating responsibly. *Id.* ¶¶ 23-24, 31.

Therefore, the record includes "no facts supporting an inference that" the Army crew "would have [had] reason to know ex ante that" failing to illuminate or warn about the helicopter "was sufficiently likely to cause serious injury as to deem it the product of a rejection of a policy goal rather than a balancing of such goals." *See Davallou*, 998 F.3d at 506 (internal quotations omitted) (alteration in original).

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion and enter summary judgment in favor of the United States on all of Plaintiffs' claims against it.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     /s/ Julian N. Canzoneri
        Julian N. Canzoneri
        Assistant U.S. Attorney
        U.S. Attorney's Office
        John Joseph Moakley U.S. Courthouse
        1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
        (617) 748-3170
        julian.canzoneri@usdoj.gov

        Christopher Morgan
        Assistant U.S. Attorney
        U.S. Attorney's Office
        300 State Street, Suite 230
        Springfield, MA 01105
        (413) 785-0269
        christopher.morgan2@usdoj.gov

Dated: April 5, 2022

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record by means of the Court's Electronic Case Filing system on April 5, 2022.

         /s/ Julian N. Canzoneri
        Julian N. Canzoneri
        Assistant U.S. Attorney