UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JEFFREY SMITH, ANTHONY SMITH, and KERRY SMITH, as next friend to minor C.S., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 19-30145-MGM |
| UNITED STATES OF AMERICA, | * * * | |
| Defendant. | * * * | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

September 23, 2024

MASTROIANNI, U.S.D.J.

I.      INTRODUCTION

This case arises out of a serious accident on March 12, 2019 involving a snowmobile and a United States Army helicopter which was parked on a snowmobile trail at night in Worthington, Massachusetts. Jeffrey Smith was the operator of the snowmobile and suffered life-changing injuries from the crash. He brings a negligence claim against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Anthony Smith, Jeffrey's now-adult son, and Kerry Smith, as next friend to C.S., Jeffrey's minor daughter, bring loss of consortium claims for their loss of society and companionship with their father.[1] This court held a bench trial, after which the parties submitted proposed findings of facts and conclusions of law.

---

[1] Because Anthony Smith became an adult during the course of this litigation, he was substituted as a named Plaintiff for Kerry Smith, as next friend to A.S., on August 24, 2022. (Dkt. No. 109.)

For the following reasons, the court concludes that it has subject-matter jurisdiction because the discretionary function exception to the FTCA's waiver of sovereign immunity does not apply. The court finds the government breached its duty of care in failing to take any steps to protect against the obvious risk of a camouflaged helicopter parked on an active snowmobile trail, in a somewhat wooded area, as darkness set. The helicopter and area where it was parked were not illuminated or marked in any way. However, the court also finds Jeffrey breached his duty to operate his snowmobile in a safe manner and avoid harm by, among other things, speeding and wearing tinted goggles at night. In comparing the negligence attributable to both the government and Jeffrey, the court ultimately finds the government is 60% responsible for the accident and Jeffrey is 40% responsible. After reducing the total damages to account for Jeffrey's comparative negligence and applying the statutory setoff as to the settlement reached with the landowner, Donald Chase, the court will award $3,306,175.90 to Jeffrey. The court will also award $100,000 to Anthony Smith and $150,000 to Kerry Smith, as next friend to C.S., after applying the statutory setoff as to their settlements with Chase.

## II.   BACKGROUND[2]

Jeffrey Smith, a practicing attorney with an office in Westfield, Massachusetts, lived in Worthington with his parents before the accident. He has two children—Anthony Smith and C.S.—both of whom lived primarily with their mother, Kerry Smith, following Kerry's and Jeffrey's divorce in 2015. Jeffrey had joint legal and shared physical custody of his children and, following his move from Ludlow, Massachusetts, they would generally stay with him every other weekend.

Prior to the accident, Jeffrey had a history of alcohol and opioid abuse. Beginning in college, Jeffrey had the first of seven major knee surgeries in both knees, resulting in chronic pain. He was

---

[2] The court finds the following facts based on the testimony and evidence presented at the bench trial, reasonable inferences therefrom, credibility determinations, and stipulations agreed-to by the parties. In addition, the court reviewed and considered the proposed findings of fact and rulings of law submitted by the parties. (Dkt. Nos. 198, 202.)

prescribed opioids by his primary care physician and became addicted in his mid-to-late 20s. In addition to obtaining opioids through his physician, Jeffrey would buy them from friends. Jeffrey also abused alcohol before the accident, consuming as many as ten drinks in a day. In January of 2016, Jeffrey admitted himself to the Brattleboro Retreat in connection with his opioid and alcohol abuse and he checked himself out after three days. Jeffrey was able to overcome his opioid addiction with the use of Suboxone, which was prescribed by a psychiatrist in 2017. However, he continued to abuse alcohol up until (and after) the accident. Jeffrey's alcohol abuse strained his relationship with his children. As Anthony testified, Jeffrey "was an asshole when he drank," often yelling at Anthony to make him another drink, driving Anthony in his car while intoxicated, and threatening to hurt Anthony. (Dkt. No. 188 at 79.) To avoid this behavior, Anthony sometimes would lock himself in his room when he was staying with Jeffrey. Both Anthony and C.S. have encouraged Jeffrey to stop drinking, but he has not been able to do so.

On the other hand, despite his alcohol abuse, Jeffrey was an active and involved parent before the accident. Anthony, who was 15 years old at the time of accident, testified that Jeffrey coached his sports teams and brought him to games, practiced sports with him at home, and snowmobiled with him, among other activities they would do together. C.S., who was 13 years old at the time of the accident, testified that Jeffrey was "an amazing dad" and coached all her sports teams. (Dkt. No. 191 at 9.) She described Jeffrey as very athletic and healthy before the accident. C.S. testified that she is very close with her father, describing him as her "best friend," and explained that she often went to her father for advice and support. (Dkt. No. 191 at 11-12.)

Prior to the accident, Jeffrey was an avid snowmobiler and golfer. He served as the President of the Worthington Snowmobile Club for over ten years.[3] Jeffrey, who grew up in Worthington,

---

[3] The Worthington Snowmobile Club sells snowmobile trail permits and maintains snowmobile trails in Worthington and surrounding communities.

began snowmobiling as a child. As an adult, he snowmobiled on the local trails countless times, often at night after work. Jeffrey and Anthony took a New Hampshire snowmobile safety course together two and a half years before the accident. Jeffrey understood, through the safety course and his own extensive experience as a snowmobiler, that snowmobile operators can "outdrive" their headlights, meaning that at a certain speed, the snowmobile's headlights will not illuminate far enough in front of the snowmobile to allow the operator to see an object with enough time to brake and/or avoid it.

A.      Events Leading up to Accident

In March of 2019, 310 Charlie Company, a medical evacuation company in the 10th Combat Aviation Brigade in the United States Army located at Fort Drum in New York, was preparing to deploy to Afghanistan. Benjamin Foster, a Chief Warrant Officer 4 ("CW4"),[4] was the standardization instructor pilot for 310 Charlie Company and was in charge of managing its air crew training program. CW4 Foster planned a training mission which included a pilot-in-command training for Chief Warrant Officer 2 ("CW2") medevac pilot Dearl Turner and a progression training for Private First Class ("PFC") crew chief Christopher Miller. A pilot-in-command training typically included "all modes of flight: Day, night, night vision goggles and instruments." (Dkt. No. 187 at 56.) Similarly, the progression training for PFC Miller was intended to include "[l]ow level flight . . . tactical training" and, on the flight back, similar training with night vision goggles. (*Id.* at 112.)

In choosing a location for the training, CW4 Foster sought to find a small public or private airfield which did not have a tower in order to "replicate what the crew will see in Afghanistan." (*Id.* at 56.) At the same time, he also wanted to find a training location close to his friend James Bowles,

---

[4] CW4 Foster was a primary witness given his role in planning and responsibility for this mission. The court assessed his testimony as generally truthful but affected by credibility issues. At times, Foster was not forthright, deflected blame, and minimized points which would reflect negatively on him. His motivations, as the officer in charge, were obvious at times as they surfaced through a dismissive demeanor regarding Plaintiffs' claims.

who lived in Worthington, so that they could meet and socialize.[5] Bowles ultimately suggested that CW4 Foster land at the Albert Farms Airfield, in Worthington. The Albert Farms Airfield is a large open field with a runway which is approximately 3,000 feet long. Huntington Road runs along the western edge of the airfield, parallel to the runway, and Radiker Road runs along the southern edge of the airfield, perpendicular to the runway.[6] Ben Albert, the former owner of the Albert Farms Airfield and a pilot, frequently used the airfield to fly his airplane in the 1980s. By the 1990s, however, no flying activity occurred at the Albert Farms Airfield, and it was instead used by the local community as a field for recreational activities, such as snowmobiling, bicycling, and dog walking.[7] Following Bowles' suggestion, CW4 Foster contacted the present owner of the Albert Farms Airfield, Donald Chase, who gave Foster permission to land anywhere on the airfield. Mr. Chase did not, however, inform Foster that he had also previously given the Worthington Snow Mobile Club permission to use the airfield as a snowmobile trail which included the area on the defunct runway.

As set forth in the AR-COP, a required U.S. Army planning and risk-assessment document, the planned route for the training mission was from Fort Drum to Albany, from Albany to Albert Farms Airfield, from Albert Farms Airfield back to Albany, and then from Albany back to Fort

---

[5] The court finds that it was not the usual practice on Army training missions to choose a location in order to meet and socialize with a civilian friend of one of the crew members. The court detected, through actual testimony and demeanor, that the other crew members were somewhat annoyed by the requirement of participating in CW4 Foster's social plans. This pre-planned social event was different than situations where the crew appreciated the opportunity to engage with and educate the public about the aircraft and their role, such as when the snowmobilers first approached the helicopter after they landed.

[6] The court and the parties participated in a view of the Albert Farms Airfield. There was nothing particularly unique about the airfield, including its location and topography, other than the fact that the runway was very close to Huntington Road, a major roadway in Worthington. As this old airfield and the landing spot was so close to a major roadway, it is surprising there was no notification of any local police regarding the potential distraction to drivers. In fact, after the helicopter landed, multiple cars pulled off Huntington Road to watch, photograph, or video record the helicopter.

[7] Despite this inactivity and the landing strip surface falling into some disrepair, the Albert Farms Airfield was listed in the Federal Aviation Administration's Visual Flight Rules map as an active airfield.

Drum. (Pls' Ex. 101.)[8] However, the actual route on the day of the training mission bypassed Albany and went straight from Fort Drum to Albert Farms Airfield.[9]

B.   Timeline of Events on March 12, 2019

On March 12, 2019, the date of the accident, Jeffrey went into his office in Westfield.[10] He met his ex-girlfriend for lunch at a restaurant in Westfield shortly after 1:00 p.m. Around this time, Jeffrey received a call from his orthopedist's office cancelling his appointment for later that afternoon. He returned to work and left the office sometime after 5:30 p.m., stopping at a gas station on his way home to fuel his car and purchase vitamin waters. Although Jeffrey testified that he left work closer to 4:00 p.m. that day, he told Sergeants Cynthia Kalkwarf and Jerry Shampang of the Massachusetts Environmental Police, three days after the accident, that "he normally leaves around 5:30, but that he had left a little later that night." (Def's Ex. 15.) The court finds the testimony of Sergeants Kalkwarf and Shampang more credible than Jeffrey's in this regard. The court recognizes that Jeffrey—who suffered serious injury, was in pain, and on medication at the hospital during his interview with Sergeants Kalkwarf and Shampang—was knocked unconscious in

---

[8] The court finds that the plan was for the night vision training to occur after the crew left the Albert Farms Airfield. CW4 Foster stated in a sworn statement following the accident that, following sunset, they "planned to then depart Night Unaided and return to Albany International (ALB) where we would make an instrument approach, refuel and return to [Fort Drum] under Night Vision Goggles." (Pls' Ex. 140.) In addition, as Foster testified, although the night training could begin any time after sunset, the "training value" increases as it gets darker. (Dkt. No. 187 at 105; *see also id.* at 123 ("Our goal was to be gone before it was dark enough to not be able to see the black helicopter on the white snow.").) Accordingly, since darkness would have continued increasing following the departure from the Albert Farms Airfield, the court infers that the night vision training was to occur sometime later, especially given that no crew members testified the night vision training was intended to occur at the Albert Farms Airfield.

[9] Plaintiff's Army aviation safety expert, Thomas A. McHale, testified that he believed CW4 Foster bypassed Albany because there was a delay at Fort Drum to swap helicopters and CW4 Foster did not want to be late for his pre-planned meeting with Bowles. The court finds, under Rule 702 of the Federal Rules of Evidence, that McHale is sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that his overall testimony was sufficiently reliable and based on adequate facts and data to be admissible. The court gives McHale's testimony as to his opinion regarding the Albany bypass some weight. The trial record supports the assertion that there was an aircraft swap, which likely resulted in some delay, and Turner testified he believed they may have bypassed Albany "so it wasn't too late to where Mr. Foster could see his friends, perhaps, so they're not walking out in the dark." (Dkt. No. 191 at 124.)

[10] Jeffrey was less than a week shy of his 44th birthday on the date of the accident, and he was 48 years old when he testified at trial.

the accident and therefore likely suffered head trauma which could have affected his memory. Nevertheless, as both parties' experts explained,[11] memories recalled in closer proximity to an event are generally more accurate than memories recalled at a later time, and the court gives significant weight to the statements Jeffrey made days after the accident.

Accordingly, after driving the half hour to Worthington from Westfield, plus the extra five to ten minutes to stop at the gas station, Jeffrey drove past the Albert Farms Airfield around 6:15 p.m. on his way to Liston's Bar and Restaurant to meet his brother. The court finds that the helicopter landed sometime between 6:15 and 6:20 p.m., meaning it is possible, but somewhat unlikely, this is when Jeffrey saw the helicopter. However, Jeffrey testified at his deposition that he actually did see the helicopter while driving to first meet his brother at Liston's.[12] Jeffrey did meet his brother at Liston's, borrowed his brother's keys to retrieve snowmobile gloves he had left at his brother's house the day before, and then after retrieving the gloves he returned the keys back to his brother at Liston's. Only about ten minutes elapsed between arriving at Liston's initially and returning his brother's keys. Jeffrey then immediately drove to his parent's house, passing the Albert Farms Airfield a second time around 6:30 p.m. A Facebook live video—which the parties agree began at 6:23 p.m.—shows the helicopter had landed, with crew members on the ground and the aircraft shutting down. While Jeffrey's trial testimony on the topic was convoluted, the court finds that Jeffrey did see the helicopter on the Albert Farms Airfield before the accident at least once while driving to his parents' house on Huntington Road after seeing his brother. Not only did he testify at his deposition to seeing the helicopter while in his car, but he also told the Massachusetts

---

[11] The court finds, under Rule 702 of the Federal Rules of Evidence, that Dr. Roger Moore (Plaintiff's memory expert) and Dr. Geoffrey Loftus (Defendant's memory expert) are sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that their overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

[12] The parties agreed to the admission of the entire transcript of Jeffrey's two-day deposition, dated January 28, 2022 and January 31, 2022. (Joint Ex. 5.)

Environmental Police and Diane Magargal while in the hospital, within days of the accident, that he saw the helicopter earlier in the day. As Jeffrey testified at his deposition, he "glanced over and . . . saw the helicopter, and [he] thought that was kind of unique." (Joint Ex. 5 at 284.)[13] As Diane Magargal testified, she visited Jeffrey in the hospital shortly after the accident and he told her: "Shame on me, I knew it was there." (Dkt. No. 188 at 28.)

Jeffrey ultimately asserted at trial that he did not see the helicopter at all before the accident but, as the government argues, that assertion is based on the timeline pieced together years after the accident by Jeffrey and his mother, Camille Smith, who claimed she arrived home shortly after 5:00 p.m. following a Town of Worthington All Boards Meeting she attended. However, Camille originally told Sergeants Kalkwarf and Shampang of the Massachusetts Environmental Police in the hospital days after the accident that her All Boards Meeting took place between 4:00 p.m. and 6:00 p.m. and she arrived home around 6:20 p.m. At trial, Camille was equivocal about the All Boards Meeting time and when she arrived home, testifying she believed the meeting "started at 3:00 and ended at . . . 5:00, but I could be wrong." (Dkt. No. 191 at 35.) Given the close proximity to the accident of Camille's original timeline and her unsure testimony at trial, the court finds it more likely than not that the All Boards Meeting was from 4:00 p.m. to 6:00 p.m. and Camille arrived home around 6:15 p.m.

Moreover, call records introduced at trial show a phone call from Jeffrey's parents' home phone number to Jeffrey's cell phone at 6:16 p.m. (Def's Ex. 1.) And at 6:27 p.m., Jeffrey's cell phone called his parents' home phone number. (*Id.*) Although Camille testified that it was common to call a family member's cell phone from the house to communicate with someone in the garage,

---

[13] Jeffrey testified at his deposition that he only saw the helicopter on his way towards Liston's but not on the way to his parent's house traveling south on Huntington Road. He also testified at his deposition that he told his brother that he saw the helicopter when the two spoke at Liston's. Jeffrey told Sergeants Kalkwarf and Shampang of the Massachusetts Environmental Police that he saw the helicopter both on his way to Liston's and on his way back while driving to his parents' house but that he thought the helicopter was in a different location the second time he saw it.

she had no specific recollection of these phone calls from the date of the accident. Moreover, both Camille and Jeffrey testified that Jeffrey was not in the garage until around 6:50 p.m. and Jeffrey's father arrived home sometime after 7:00 p.m. Jeffrey saw his father both in the garage and back at the house just before leaving on his snowmobile around 7:25 p.m. Accordingly, during the time when the two phone calls were made from and to the parents' home phone number (6:16 and 6:27), Jeffrey would not have been in the garage yet. The court therefore finds Camille called Jeffrey at 6:16 p.m. upon her arrival at home, and Jeffrey called his parents' home phone number after leaving Liston's and during the drive to his parents' house.

In weighing the testimony of the parties' memory experts, both of whom were well aware of Jeffrey's hospitalization, injuries, and treatment, the court finds Defendant's expert, Dr. Geoffrey Loftus, more persuasive. As Dr. Loftus explained, "there is a lack of any obvious source of postevent information that would have led Mr. Smith," during the interview with the Massachusetts Environmental Police, "to confabulate the presence of a helicopter that he actually didn't see." (Dkt. No. 192 at 191-92.) The interview took place only days after the accident which meant, according to the "gold rule of memory," that it was more likely to be accurate compared to his reports years later because "the greater the delay, the more opportunity there is for potentially false postevent information to be incorporated into memory." (Dkt. No. 192 at 185-86.) Plaintiff's expert, Dr. Roger Moore, agreed that memories reported closer in time to an event are more likely to be accurate. Moreover, Dr. Moore could not point to any specific post-event information in the days following the accident as a likely source of Jeffrey's allegedly false memory; he speculated as to some potential sources, such as family members possibly discussing the accident around Jeffrey while he came in and out of consciousness, but he could point to no concrete evidence on which to base such conjecture. In contrast, both Jeffrey and Camille testified that they had multiple conversations in the years following the accident attempting to establish the timeline of events and, as mentioned,

Jeffrey bases his timeline on Camille's report of arriving home shortly after 5:00 p.m. but that report itself shifted over time compared to her original statement given to the Massachusetts Environmental Police in the hospital. In light of all the evidence, the court is simply not persuaded by Jeffrey's theory that he confabulated a false memory of having seen the helicopter prior to the accident.

Upon arriving home, Jeffrey helped his mother Camille with an issue she was having with her printer. He then helped her look up and print Massachusetts statutes related to her work on the Worthington Council on Aging. These activities took approximately 20 to 30 minutes combined. Jeffrey then went out to the garage around 7:00 p.m. for approximately ten minutes to check and prepare his snowmobile, during which time he drank one Bud Lite beer. Jeffrey's father arrived home during this time and had a beer in the garage as well. Jeffrey then rode his snowmobile from the garage back to the house, ate a quick leftover dinner which Camille heated for him, spoke on the phone with his ex-girlfriend for 5 to 10 minutes, and put on his snowmobile gear. During this time back at the house, Jeffrey drank a second Bud Lite Beer. At approximately 7:25 p.m., Jeffrey rode on his snowmobile on a trail connected to his parents' property, traveling towards the Albert Farms Airfield.

Meanwhile, earlier in the day before landing, the U.S. Army helicopter did a "low pass" over the Albert Farms Airfield to scope out the area. (Dkt. No. 187 at 115.) During this flyover, the crew saw snowmobile tracks on the field.[14] Staff Sergeant Nicholas Rossi testified that the crew had "heard rumors that there were snowmobiles in the area" before landing. (*Id.*) CW4 Foster testified that the snowmobile tracks were "on the actual runway" and described seeing four-foot-tall "orange wands" marking the snowmobile trail, although he could not recall whether he saw these markings

---

[14] The actual airstrip was covered in hardpack snow and was not visible, so the crew "kind of ballparked . . . where the airstrip would be" when landing. (Dkt. No. 187 at 134.)

before or after the accident. (Dkt. No. 187 at 38-39.) In addition, CW2 Turner testified to "hearing from locals that there was snowmobile trails in the area and one happened to go through the property," after landing. (Dkt. No. 191 at 5.)

When the helicopter landed, Bowles and his family were already there waiting as were other local onlookers who had heard about the arrival of a helicopter beforehand. After shutting down the aircraft, the crew encountered numerous snowmobilers traveling near the helicopter, many of whom stopped to look at the helicopter and chat with the crew. It was still light out at this time and the snowmobilers traveled at low speeds (5 to 10 miles per hour) and did not almost hit the helicopter. The crew then left the helicopter unattended and traveled over 100 yards with Bowles and his family to a plowed parking area north of the airstrip. Bowles had brought some food and beverage for the crew, which they ate and drank while socializing with Bowles and his family in the parking area for around 45 minutes. During this time, no crew members were assigned to supervise the unlit and unmarked helicopter sitting directly on the snowmobile trail and none of them paid attention to it (although some of the crew testified unconvincingly that it remained in their sight).

At approximately 7:15 p.m.,[15] while the crew were socializing with Bowles and his family in the parking area, Mike Martin rode his snowmobile north on the trail/runway on the Albert Farms Airfield and nearly struck the helicopter. Martin, who the court finds highly credible, testified he was riding between 30 and 60 miles per hour and did not see the helicopter until the last moment due to a slight rise or mound in the runway. He came within 15 to 20 feet of the helicopter's tail and swerved to the left to avoid it. Martin then exited his snowmobile and took a photograph of both the helicopter and his snowmobile. (Pls' Ex. 132.) He testified there were no crew members in sight and he "could have walked right in and taken the thing if [he] knew how to drive it." (Dkt. No. 188

---

[15] On the night of the accident, sunset was at 6:54 p.m. and civil twilight ended at 7:22 p.m. (Joint Ex. 1.) At civil twilight, the sun is 6 degrees below the horizon.

at 53.) The photograph shows that light was diminishing and the helicopter was beginning to blend in with the tree canopy in the background; it does not show any individuals in or around the aircraft. (Pls' Ex. 132.)[16] No crew member saw any of this incident with Martin and the helicopter. Martin then rode to Liston's, had a cigarette outside, and then went inside and warned others about the helicopter's presence on the snowmobile trail.

## C.    The Accident

By 7:30 p.m., the Army crew had returned to the helicopter with Bowles and his family, and some crew members had started preparing to depart, although neither the helicopter nor its Auxiliary Power Unit ("APU") were turned on yet. CW4 Foster was standing on the left side of the north-facing helicopter "saying good-bye to the Bowles family and helping usher them away from the aircraft." (Dkt. No. 187 at 46.) Jeffrey, continuing on the snowmobile trail, crossed Radiker Road and entered the southern end of the Albert Farms Airfield. He then pulled off to the left parallel to the trail, pulled his tinted goggles off, and shined his snowmobile headlight up the trail in an attempt to see if the helicopter (or anything else) was still there.[17] However, given the distance, the angle, and

---

[16] The parties stipulated that a separate photograph, Plaintiff's Exhibit 124, was taken at 7:07:55 p.m. (Dkt. No. 155, Stip. No. 21.) It was taken from inside a vehicle on Huntington Road and also shows the helicopter with no crew members around. (Pls' Ex. 124.) Although the angle of the photograph is slightly different than Martin's photograph, the lighting in Plaintiff's Exhibit 124 is noticeably brighter and the helicopter does not appear to blend in with the background tree canopy to the same extent as Martin's photograph.

[17] At trial, Jeffrey provided inconsistent testimony as to whether he stopped at the southern end of the airstrip and attempted to look up the runway to see anything that might be there or, in contrast, simply stopped to fix the strap of his goggles before proceeding on. At his deposition, Jeffrey testified he stopped and shined his headlight up the field "to see if there was anything there, if there was still a helicopter there," because he "still had it in the back of [his] mind that there was something, that they had landed earlier, and [he] didn't know where they might be." (Joint Ex. 5 at 103.) And Jeffrey told Sergeants Kalkwarf and Shampang of the Massachusetts Environmental Police days after the accident that he "was looking for" the helicopter since he had seen it earlier in the day. (Def's Ex. 15; Dkt. No. 194 at 106-07, 140.) In fact, Sergeant Shampang testified that he recommended Jeffrey be charged with reckless/negligent operation of a snow vehicle due to his speed "[a]nd because Mr. Smith was aware of this helicopter being on the airstrip twice prior to taking the snowmobile out," among other factors. (Dkt. No. 194 at 110.) In light of all the evidence and inferences therefrom, including the court's determination that Jeffrey saw the helicopter earlier in the day, the court finds Jeffrey did stop and attempt to find the helicopter from the southern end of the airstrip.

the increasing darkness, Jeffrey could not see the helicopter, which, the court finds, blended in with the tree canopy and hills in the background from the direction Jeffrey approached.

The parties offered the testimony of visibility experts: Dr. Michael Crognale for Plaintiffs; and Dr. Ronald Gibbons for Defendant.[18] As both experts explained, our ability to see an object is based on the degree of contrast the object has in relation to its background as well as the object's reflectiveness. Thus, as Dr. Crognale explained,

> when the target has the same properties as the background, it becomes camouflaged. And of course the Army knows this very well and has developed some very low reflective paint to prevent the visibility of helicopters, for example. And it works quite well. So when an object like a helicopter is viewed against a dark background, which is – was the case in this accident, then it becomes very, very difficult to detect.

(Dkt. No. 188 at 146-47.) Dr. Crognale measured the reflectiveness of the helicopter's rear stabilator (which Jeffrey struck) and explained that "it had very, very low reflectivity. It matched the standard black on a . . . color checker chart, for example, in its reflectiveness, which is less than 10 percent, which is quite dark." (*Id.* at 152-53.) Dr. Crognale explained that "if something has very low reflectance . . . [i]t is going to be very invisible against something very dark. And it just so happens that the reflectivity of the surrounding forest was about the same as that of the paint on the helicopter," meaning that "the paint of the helicopter essentially blended in with the background of the forest." (*Id.* at 153.) He explained that, from the vantage of a snowmobiler traveling north up the slight rise on the runway, the helicopter might have been visible "against the sky just at the point of impact . . . [b]ut prior to that, it would have been viewed against the trees." (*Id.* at 178.) Dr. Crognale also measured the lux value, which shows the level of illumination, at the Albert Farms Airfield on a date and time when "the astronomical conditions matched that at the presumed time of the accident." (*Id.* at 151.) Over the course of 16 minutes, the light level dropped from "about 7 ½ lux"

---

[18] The court finds, under Rule 702 of the Federal Rules of Evidence, that Dr. Crognale and Dr. Gibbons are sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that their overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

to ".1 lux," demonstrating that the light level "decreases rather rapidly when the sun goes down." (*Id.*) In addition, Dr. Crognale explained that the crew and onlookers on the ground near the helicopter would have had a better ability to adapt to the reducing light after sunset in comparison to "somebody who is looking at . . . the world illuminated by a bright headlamp on a sled." (*Id.* at 161.) Dr. Crognale ultimately opined that "it would have been very difficult for" an average snowmobile operator on the night of the accident "to detect the helicopter at normal operating speeds in time to avoid a collision." (*Id.* at 164.)

Dr. Gibbons agreed with Dr. Crognale's measurement of the reflectivity of the helicopter. He also agreed that it takes longer for our eyes to adapt from light to darkness as compared with adapting from dark to light. Dr. Gibbons, who also visited the Albert Farms Airfield, provided two general opinions. First, he opined that there was "enough contrast to . . . perceive the helicopter . . . in the environment that it was in, with the helicopter appearing against the sky or the snow." (Dkt. No. 192 at 127.) Second, he opined that the choices made by Jeffrey—his speed, wearing tinted goggles, and consuming alcohol—"led to the visibility issue." (*Id.* at 128.)

The court gives significant weight to Dr. Crognale's opinion regarding the visibility of the helicopter and little weight to Dr. Gibbons on this issue. The parties introduced a number of photographs, some taken after the accident during the daytime, demonstrating that the helicopter's dark color blended in with the forested background, especially from farther distances looking north up the airfield. The court itself had trouble locating the helicopter in one photograph, even with cones surrounding the helicopter and being told by a witness that it was there. (Pls' Ex. 122.) The court finds Mike Martin's testimony on this question highly credible, as he was riding from the same direction as Jeffrey approximately 15 minutes before the accident, when it would have been significantly lighter outside. Martin's explanation of narrowly missing the helicopter, because he could not see it until the last moment, supports Dr. Crognale's opinion as to the helicopter's

14

visibility. Although other witnesses stated there was ample ambient light to see the helicopter, they were significantly closer to the helicopter and viewing it from a different angle, which allowed the helicopter to be visible against the lighter sky and the snow. It was the angle of Jeffrey's approach which resulted in the helicopter camouflaging with the tree canopy in the background.[19] Moreover, as Dr. Crognale explained, because the witnesses had been outside for some time as darkness increased, their eyes were able to adapt better to the lessening light. In the court's view, Dr. Gibbons did not persuasively explain why or when Jeffrey would have been able to see the helicopter, especially considering the trees in the background when looking from Jeffrey's angle.

However, the court does give Dr. Gibbons' second opinion significant weight. Dr. Gibbons explained that "[t]ypically alcohol will decrease your contrast sensitivity," and "[i]t also increases your time to understand the contrast." (Dkt. No. 192 at 125.) Although Dr. Gibbons could not quantify "the degree to which Mr. Smith's . . . ability to perceive contrast was impacted by alcohol," he explained that "because of the presence of alcohol" in general, the "requirements for contrast" were necessarily increased. (*Id.* at 136.) Dr. Gibbons also explained that tinted goggles "reduce the amount of light available to you," which "means you need more contrast to see something." (*Id.* at 127.)[20] He did a "paper study" of Jeffrey's googles, using a photograph of the goggles (since the physical goggles were not made available) and compared the "light behind the goggles and light[] through the goggles" to determine a ratio representing "the transmissivity of the glasses." (*Id.* at

---

[19] The crew, having worked on such dark-colored helicopters in the past, clearly would have understood this camouflaging effect.

[20] The court rejects the contention that Jeffrey's goggles were photochromatic and thus adjusted to the level of light available. Rather, the goggles, which were introduced as a physical exhibit at trial, are clearly polarized, as stated on the lens. Plaintiffs did not introduce any evidence showing that Jeffrey's goggles were photochromatic; they questioned one of Defendant's experts based on an advertisement for a retailer of Jeffrey's brand of goggles, but the lens in the advertisement had the word "photochromatic" on it, unlike Jeffrey's goggles which state on the lens "polarized." (Dkt. No. 195 at 131; Dkt. No. 176-4; Def's Ex. 8.) The court also granted Defendant's mid-trial motion in limine to preclude Plaintiff from recalling Dr. Crognale as a rebuttal expert on this issue because Plaintiffs failed to timely disclose such expert rebuttal testimony. (Dkt. No. 179.)

138.) Dr. Gibbons did acknowledge the results of the paper study—the goggles measured between 12 and 48 percent transmissive—were less certain than if he had used the actual googles. However, the important point is that Jeffrey's "goggles limited," in at least some perceptible way, "the amount of light available to" him, resulting in some reduction in the ability to perceive contrast. (*Id.* at 156.) As for speed, Dr. Crognale acknowledged that "objects travelling more slowly or a person travelling more slowly has more time available to" visually detect something. (Dkt. No. 188 at 195.) The court finds that Jeffrey's speed, tinted goggles, and at least slight impairment—in addition to the darkness and the helicopter blending in with the trees—all played a role in his failure to see the helicopter until it was too late.

After crossing Radiker Road and not spotting the helicopter, Jeffrey then returned to the trail and accelerated up the slightly inclined straightaway. He pushed his snowmobile throttle all the way down for about five seconds, reaching a speed of 65 to 70 miles per hour. Witnesses described hearing the snowmobile accelerate and only seconds later crashing into the helicopter; they also described how it sounded like the snowmobile was traveling very fast. Bowles, for example, explained it happened so fast that he did not have time to react and move his family out of the way. CW4 Foster tried to catch Jeffrey's attention by freeing and illuminating his headlamp[21] underneath his jacket but was not able to do so. As he approached the aircraft, Jeffrey's eyes eventually caught a glimmer of light reflecting off a stainless-steel helicopter part. Jeffrey first attempted to slow the snowmobile down to a safer speed by pumping the brakes to avoid flipping over when turning. Heading toward the center of the helicopter's tail, he then turned to the right and pushed the throttle in an attempt to "power out of it." (Dkt. No. 189 at 179.) He moved three or four feet to

---

[21] Bowles testified that one crew member may have been using a headlamp inside the helicopter but no one "outside was using any light." (Dkt. No. 192 at 62.)

the right but could not clear the last few feet of the right stabilator.[22] Upon impact, Jeffrey turned his body to the right and struck the stabilator with his left torso. His snowmobile traveled under the stabilator and Jeffrey's body launched off the stabilator into the air, both eventually coming to rest in front of the helicopter. The crew and onlookers attended to Jeffrey, who was knocked unconscious and had difficulty breathing due to a punctured lung. He was taken by helicopter that night to Baystate Medical Center in Springfield for emergency surgery. Shortly after the accident, the Army crew placed chem-lights (also known as glow sticks) in the ground near the helicopter in an attempt to warn any other snowmobilers who might drive through. Later, a local emergency vehicle used lights to illuminate the helicopter overnight.

The parties offered the testimony of accident reconstruction experts: Matthew Dwyer for Plaintiffs; and Richard Hermance for Defendant.[23] Mr. Dwyer opined that Jeffrey was traveling between 26 and 39 miles per hour before he began braking his snowmobile and that he was traveling between 18 and 28 miles per hour when he struck the helicopter. However, these speeds are inconsistent with the testimony of numerous eyewitnesses as well as Jeffrey, who testified he "looked down once [at his speedometer] and I saw I was going 65" miles per hour. (Dkt. No. 189 at 164.) Moreover, Mr. Dwyer testified that he did not "do any analysis or calculations of how much energy was lost with the snowmobile colliding into the stabilator" because, in his view, the damage to the stabilator looked "more cosmetic as opposed to structural damage." (Dkt. No. 185 at 104.) Thus, Mr. Dwyer's calculation of speed both before and at impact—which relied on the total throw distance of Jeffrey—did not take into account the energy or speed lost at impact, even though

---

[22] The stabilator is a wing-like horizontal piece which extends approximately seven feet in each direction off the helicopter's tail.

[23] The court finds, under Rule 702 of the Federal Rules of Evidence, that Mr. Dwyer and Mr. Hermance are sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that their overall testimony was sufficiently reliable and based on adequate facts and data to be admissible. However, in weighing their testimony and ultimate opinions, the court gives Mr. Hermance's testimony and opinions significantly more weight than Mr. Dwyer's.

Dwyer acknowledged that Jeffrey's collision with the stabilator "caused a reduction in energy." (*Id.*) Mr. Hermance persuasively explained that the damage to both the stabilator and Jeffrey's body was significant, which means there was a lot of energy lost upon impact. Accordingly, as Mr. Hermance explained, Mr. Dwyer's failure to account for the energy lost at impact means that his speed calculations are inaccurate. The court agrees with Mr. Hermance's criticism of Mr. Dwyer's calculation and, given that Dwyer's calculation is also starkly different than the witness testimony, the court gives Mr. Dwyer's speed calculations little weight.

Mr. Hermance, who has extensive experience with snowmobile accident reconstruction and snowmobile safety, testified that the generally accepted speed at which an unimpaired snowmobiler can safely stop at night—*i.e.*, not outdriving their headlight—would be about 35 or 40 miles per hour. That is based on the snowmobile's headlight illuminating at least 200 feet in front, a "normal friction" of .4 or .5 for a snowmobile driving on the snow, and a typical perception-reaction time of 1.5 seconds for the snowmobiler to perceive an object and then react to it. (Dkt. No. 195 at 69.) Thus, at 40 miles per hour, the snowmobile would travel 88 feet before the operator perceived and reacted to the object and then, upon applying the brakes, the snowmobile would travel another 70 feet before stopping, resulting in a total distance of 158 feet and allowing the operator to avoid the object within the 200 feet of illumination from the headlight. At 65 miles per hour, it would take an unimpaired snowmobiler between 423 and 544 feet to stop after seeing an object. (*Id.* at 87.) Similarly, at 65 miles per hour, a snowmobiler with even a normal perception-reaction time would not be able to swerve and avoid the stabilator, which measured approximately 7 feet from the center of the helicopter to its edge. Ultimately, Mr. Hermance opined that Jeffrey "was outdriving his headlights" by driving at a speed that "was not prudent for the conditions"; he was "under the influence of alcohol and drugs to some extent," which would have increased his perception-reaction time; and he was riding at night with tinted goggles, which reduced the amount of light available to

18

him. (*Id.* at 91.) The court gives Mr. Hermance's opinion significant weight, given his extensive experience, credible explanations, and his opinion's consistency with the other evidence.

The government also called a toxicology expert, Dr. David Greenblatt, a board-certified physician in the discipline of clinical pharmacology.[24] Dr. Greenblatt opined that based on Jeffrey's blood serum alcohol concentration taken 90 minutes after the accident, together with the concentration of clonazepam in his blood sample and the detection of suboxone (at an unknown concentration level), Jeffrey "had high probability of having impaired vehicle operating capacity at the time of the accident." (Dkt. No. 195 at 10.) Dr. Greenblatt explained that Jeffrey's blood serum alcohol concentration, taken at 9:00 p.m. on the night of the accident at Baystate Medical Center, was .052 percent. (Def's Ex. 36 at 4.) Converting the serum concentration into "a whole blood concentration" results in a figure of .045 percent. (Dkt. No. 195 at 14.) Then, Dr. Greenblatt extrapolated back to the time of the accident, 7:30 p.m., using "the known rate of alcohol elimination from the body in an otherwise healthy individual" of .02 percent per hour. (*Id.* at 15.) Thus, during the 90 minutes between the accident and taking the blood sample, the blood alcohol concentration would have fallen by .03 percent, resulting in an estimated .075 percent blood alcohol concentration at the time of the accident. Although Massachusetts law sets a blood alcohol concentration limit of .08 percent for snowmobile operators who are over 21 years old, Mass. Gen. Laws. ch. 90B, § 26A(a)(1), Dr. Greenblatt explained that the relationship between blood alcohol concentration and functional impairment is a "continuous relationship," rather than a "yes/no relationship," meaning that "the higher the concentration in blood, the higher the concentration is in the brain and the greater is the level of impairment." (*Id.* at 18.) Dr. Greenblatt explained that the skills that alcohol impairs

---

[24] The court finds, under Rule 702 of the Federal Rules of Evidence, that Dr. Greenblatt is sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that his overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

> include functions such as recognition of hazards, the time of response to hazards, the
> decision as to what course of action is best. All of these things are slowed. And finally,
> the actual motor function of making the adjustment that is needed to compensate for
> the hazard, that is also slowed and also can be inaccurate.

(*Id.* at 18-19.) However, Dr. Greenblatt also explained that it is not "possible to say with scientific

certainty that a specific amount of . . . alcohol . . . produces any sort of specific level of impairment,"

because "there are other factors in the mix, like a person's sensitivity to alcohol." (*Id.* at 19.) Thus,

Dr. Greenblatt explained, "[w]ith habitual exposure . . . to high amounts of alcohol, that can lead to

what is usually called 'tolerance.' And that can be a factor which reduces sensitivity." (*Id.* at 37.)

Jeffrey's blood sample additionally detected clonazepam, also known as Klonopin, at a

concentration of 5.8 nanograms per milliliter. (Def's Ex. 21.) Dr. Greenblatt explained that

clonazepam "is a drug of the benzodiazepine class, which are widely used in clinical practice, and

include other drugs like Valium, Xanax, Ativan, et cetera." (Dkt. No. 195 at 19-20.)

Benzodiazepines, Dr. Greenblatt explained, are "sedatives, and they have a mechanism of action

very similar to alcohol," and "they're used to treat anxiety, panic disorder, sleep disorders,

sometimes seizure disorders." (*Id.* at 20.)[25] Dr. Greenblatt explained that, similar to alcohol, "the

higher the concentration" of clonazepam, "the greater the likelihood of impaired function. And the

type of impairment is essentially the same as that produced by alcohol because the two drugs act on

the same recognition or receptor site in the brain." (*Id.* at 22.) Moreover, when alcohol and

clonazepam are combined "they will have effects that add up, and so it will be the sum of the effects

of the two added together to produce impairment." (*Id.*) However, Dr. Greenblatt also explained

that individuals can develop a tolerance to clonazepam as well, such that over time "they will have

some diminishment of things like sedation and impairment." (*Id.* at 46.)

---

[25] Jeffrey testified he had a prescription to take clonazepam on an as-needed basis for anxiety and that he typically took
this medication, when needed, at night.

In addition, Jeffrey's blood sample showed a positive screen for buprenorphine, also known as Suboxone, but did not include a concentration level. (Def's Ex. 21.) Buprenorphine can be used "as a deterrent treatment for substance abuse disorders." (Dkt. No. 195 at 23.)[26] It also has "some central depressant affects on the nervous system. So if anything, it would have some additive affect, but it is really difficult to tell what role it plays because we only know that it was detected. We don't know what the concentration was." (*Id.*) Jeffrey's blood sample also detected amphetamine at a concentration of 186 nanograms per milliliter, which Dr. Greenblatt testified is a "level consistent with taking therapeutic doses of Adderall for ADHD." (Def's Ex. 21; Dkt. No. 195 at 48.)[27] Dr. Greenblatt explained that Adderall is a stimulant, but he could not offer an opinion on its impact on driving proficiency or the effects of combining Adderall with alcohol.

The court gives Dr. Greenblatt's testimony significant weight and finds that Jeffrey was at least slightly impaired by the combined, or "additive," effects of alcohol, clonazepam, and buprenorphine when he was operating his snowmobile on the night of the accident and that this impairment was a contributing factor in Jeffrey's failure to see the helicopter until it was too late. On the other hand, there was testimony that Jeffrey was a habitual alcohol drinker before the accident, consuming as many as 10 drinks in a day. As Dr. Greenblatt explained, habitual drinkers tend to develop some level of "tolerance" to alcohol which can reduce their sensitivity to alcohol and thus their level of impairment. Jeffrey's mother Camille also testified that she was in close proximity to Jeffrey just before he left on his snowmobile and that he was not intoxicated at all at that time. Nevertheless, in combination with the light conditions and difficulty detecting the helicopter against the tree canopy as well as Jeffrey's speed and use of tinted goggles, the court finds Jeffrey's slight

---

[26] As mentioned, Jeffrey obtained a prescription for Suboxone in 2017 and it helped him to overcome his opioid addiction.

[27] Jeffrey testified he obtained a prescription for Adderall from his primary care physician after his son was prescribed Adderall for his ADHD and he noticed the two had similar symptoms of difficulty concentrating and lack of focus.

level of impairment contributed to the accident by slowing his reaction time and reducing his ability to perceive contrast and thus detect the helicopter.

D.    The Aftermath

Jeffrey sustained extensive injuries from the accident. He broke his clavicle, scapula, and multiple ribs, punctured his left lung, damaged his diaphragm, herniated multiple discs, and dislocated his right thumb, among other injuries. Due to his broken ribs, some of which were fractured in multiple locations, Jeffrey had a "flail" chest, which prevented a portion of his chest wall from moving and assisting the lungs to oxygenate. However, even after surgery which drained blood to relieve a tension hemopneumothorax—blood and air collecting in his pleural cavity around the lung—Jeffrey still had an elevated hemidiaphragm, which meant his diaphragm muscle was not contracting. As Jeffrey would later find out, after treating with Dr. Justin Brown, a neurosurgeon at Massachusetts General Hospital, Jeffrey sustained significant neurological damage, including to his brachial plexus and the phrenic nerve that connects with the diaphragm and operates the pulmonary function. As Dr. Brown testified, he discovered that "evulsions" accounted for most of his injuries, meaning "that the nerves had actually been pulled clean out of the spinal cord itself." (Dkt. No. 189 at 12.) The government's medical expert, Dr. John C. Richmond,[28] gave a similar explanation:

> The most important part of those [injuries to Jeffrey's left upper extremity] was evulsions of multiple nerve roots from the cervical spine, so it -- a major damage to what is called the brachial plexus, which is kind of a connection of -- if you regard the nerves as being electrical wires, he had a big connection of wires that were pulled apart and pulled off his spine. And as a result of that, he had significant neurologic issues.

(Dkt. No. 191 at 60.) Because of his phrenic nerve paralysis, Jeffrey "cannot get lung volume on the left side. And so he remains winded. So climbing stairs, walking short distances for him, cause him to become winded." (Dkt. No. 189 at 18.)

---

[28] The court finds, under Rule 702 of the Federal Rules of Evidence, that Dr. Richmond is sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that his overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

The damage to Jeffrey's brachial plexus also resulted in essentially no use of his left arm. As Dr. Brown explained: "The brachial plexus has five major nerves around the arm, and of those, one was partially working," and "[t]he rest were not functional at all." (Dkt. No. 189 at 6.) Thus, Jeffrey "had no motor function of the [left] shoulder, the biceps, the triceps"; in the left forearm, "he just had weak finger flexion," "[a]nd he had a shrug of the trapezius muscle," but no other functionality. (*Id.* at 8.) With fewer working nerves around the arm, there were fewer surgical options available. Dr. Brown was able to connect the spinal accessory nerve, which controls the shrugging muscle, to the suprascapular nerve, "which can give the shoulder abduction and external rotation," by using a posterior approach after he "couldn't make that connection from the front." (*Id.* at 12.) Later, Dr. Brown attempted a surgery transferring muscle from Jeffrey's leg to his arm, but that surgery failed and the muscle died due to blood clotting.[29] As a result, Jeffrey "has very little function left in his arm"; he "has essentially no motion from the shoulder down and marked deficit in sensation, essentially no functional sensation in his hand." (Dkt. No. 191 at 60.) Jeffrey therefore has great difficulty with everyday tasks that require two hands such as dressing himself and cutting food, and his parents or children have to help him with these activities.

In addition, Jeffrey's left leg "had a complete evulsion of [the] common peroneal nerve, which is one of the major nerves to the lower half of the leg." (Dkt. No. 191 at 62.) This resulted in a "foot drop," which meant "he couldn't elevate or lift his foot up in the air," "[a]nd he had no sensation over a large part of his leg as well." (*Id.*) Dr. Brown repaired the common peroneal nerve, "achieve[ing] basic function of the leg . . . enough that he was able to get out of a brace" and eliminating the foot drop. (Dkt. No. 189 at 14.) However, Jeffrey still has a stiff ankle and lack of

---

[29] Dr. Brown also performed a complex operation on the intercostal nerves, which are located in the ribs, "to try to get his elbow to flex." (Dkt. No. 189 at 14.) Dr. Richmond, who conducted an independent medical examination of Jeffrey in June of 2023, testified that he believed the intercostal nerve operation worked "a little bit" in giving Jeffrey more motion in his left arm, but when Dr. Richmond examined him, "it was gone." (Dkt. No. 191 at 66.)

strength as well as loss of motion, including a "steppage gait," which means "[h]e has to hike his hip because the foot comes almost to neutral with full effort but it doesn't come past neutral," "[s]o catching his toe is a concern." (*Id.* at 16; *see also* Dkt. No. 191 at 64 ("He walked with what we call a 'steppage gait,' meaning he has to flex his hip and knee more to get his foot to clear. So it is similar to a dropped foot. But it is more just because of the limited motion he has.").) As a result, Jeffrey has fallen "on several occasions" after catching his toe on the ground when walking. (Dkt. No. 189 at 63.)

Dr. Brown testified that Jeffrey needs a number of additional surgeries in the future. For his pulmonary issue, Jeffrey should have a "diaphragmatic plication" surgery, whereby a thoracic surgeon "take[s] redundant muscle and . . . sort of suture[s] it and fold[s] it over on itself to pull it down and open up that lung a bit." (Dkt. No. 189 at 18-19.) However, since the accident, Jeffrey has gained a substantial amount of weight,[30] which makes the plication surgery more difficult "[b]ecause the more central obesity you have, the more pressure pushes up on that diaphragm, and the harder it is to just fold it over and bring it back down." (*Id.* at 19.) Accordingly, Jeffrey needs to lose weight before the diaphragmatic plication surgery can occur. At Jeffrey's last visit with Dr. Brown, he referred Jeffrey to a bariatric specialist to perform bariatric surgery, also known as stomach stapling, but Jeffrey has not yet pursued that surgery.[31] After the bariatric surgery and plication surgery, Jeffrey should also have a glenohumeral fusion—"affixing the scapula to the humerus"—to stabilize

---

[30] Jeffrey testified that after each surgery, there is a significant recovery period during which his mobility is even more limited. These surgeries and recoveries as well as his impaired pulmonary function have contributed to Jeffrey's weight gain. For example, Jeffrey testified that his last surgery—the failed muscle transfer—"made my breathing, stamina, and getting around much worse." (Dkt. No. 190 at 55.)

[31] Dr. Richmond testified that when he met with Jeffrey in June of 2023, Jeffrey was understandably "pretty fed up with surgeries because the one that he had had most recently," the muscle transfer, "was a complete failure," "[s]o he was a little down." (Dkt. No. 191 at 86.) Jeffrey also testified that he "was weighing [his] options with" the bariatric surgery or, instead, using prescription medication, such as Wegovy®, to lose weight; he has a prescription for Wegovy®, but he could not find any of this medication at the time of the trial. (Dkt. No. 190 at 40.)

his shoulder; a tendon transfer for his left foot to help with the steppage gait; and perhaps another muscle transfer to attempt to get his left elbow to flex. (*Id.* at 17.)

Despite his limitations, Jeffrey is able to perform some household chores, such as vacuuming, mowing the lawn on a riding mower, and making the bed; he can also drive a car and occasionally shops at the grocery store. On the other hand, in addition to his physical ailments, Jeffrey testified that he fell "into a deep depressive state" after the accident. (Dkt. No. 190 at 88.) He feels isolated from friends, with whom he used to golf and snowmobile among other activities.

Jeffrey's injuries have also substantially affected his law practice. Apart from the recovery time following his surgeries, Jeffrey has limited stamina and gets tired easily. He explained that his left arm "is like carrying around a 30-pound weight, dead weight, on my left side all day. So even sitting in a chair . . . gets me tired after a while." (Dkt. No. 190 at 82.) In addition, Jeffrey's limited pulmonary capacity means that relatively non-strenuous activities, like walking short distances, result in him becoming winded and needing to catch his breath and becoming tired. Jeffrey also has difficulty sleeping because he has to sleep in one position and gets cramps which wake him up in pain. He often naps in the afternoon to regain energy and catch additional sleep. He also gets "phantom pain . . . that shoots down" into his hand and left side of his body, which makes him lose focus. (*Id.* at 85.) Jeffrey has had trouble meeting deadlines and can no longer engage in networking activities. Since recovering from his latest surgery, Jeffrey works an average of 10 hours per week, often from home. His annual net earnings dropped from $134,394 in 2018 (before the accident) to a loss of $5,671 in 2022 (after the accident). (Def's Exs. 29, 71.) In addition, Jeffrey increased his use of a paralegal from a "per diem basis" in 2017 to a regularly scheduled 25 hours per week employee in 2020 or 2021, resulting in increased business expenses in the form of paralegal wages. (Dkt. No. 190 at 59.)

Based on this incident, Jeffrey was charged by the Commonwealth of Massachusetts with operating under the influence ("OUI") of alcohol and/or drugs in violation of Mass. Gen. Laws ch. 90B, § 26A(a), as well as reckless or negligent operation of a snow vehicle in violation of Mass Gen. Law ch. 90B, 26B(a). The OUI charge was dismissed after the Commonwealth entered a nolle prosequi, with the prosecutor explaining that the "Commonwealth did not believe it would be able to prove impairment due to a lack of evidence as to the defendant being under the influence at the time." (Def's Ex. 62 at 6.) As to the reckless/negligent operation charge, it was continued without a finding after Jeffrey admitted to sufficient facts for a guilty finding and completed two safety courses. At the plea hearing on March 8, 2023, Jeffrey admitted that he drove the snowmobile "at a high rate of speed." (*Id.* at 4.)

## III.   DISCRETIONARY FUNCTION IMMUNITY

The United States is generally immune from suit without its consent. *See Evans v. United States*, 876 F.3d 375, 380 (1st Cir. 2017). The FTCA, however, "provides for a limited waiver of this sovereign immunity and authorizes suits against the United States for certain torts." *Id.* (citing 28 U.S.C. § 1346(b)(1)). In particular, the FTCA permits "civil actions on claims against the United States" for "injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . where the United States, if a private person, would be liable" under "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Nevertheless, the FTCA also contains certain exceptions which narrow the United States' waiver of sovereign immunity. *See Evans*, 876 F.3d at 380. One of these exceptions, known as "the discretionary function exception, bars liability for claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Id.* (quoting 28

U.S.C. § 2680(a)). This exception "preserves the separation of powers by 'prevent[ing] judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Reyes-Colon v. United States*, 974 F.3d 56, 58 (1st Cir. 2020) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984)). "[T]he discretionary function exception applies if the conduct underlying an FTCA claim both (1) 'involves an element of judgment or choice,'" . . . and (2) 'was susceptible to policy-related analysis.'" *Sanchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 93 (1st Cir. 2012) (quoting *Limone v. United States,* 579 F.3d 79, 101 (1st Cir.2009)).

The first step in this analysis is to "identify the conduct that is alleged to have caused the harm." *Evans*, 876 F.3d at 380 (quoting *Fothergill v. United States*, 566 F.3d 248, 252 (1st Cir. 2009)). Here, the conduct that is alleged to have caused the harm is the failure to take any steps to warn, eliminate, or mitigate the danger of leaving a helicopter camouflaged by dark paint, which remained unilluminated, in the middle of an active snowmobile trail from early evening through dusk.[32] As to the first prong, the court finds that this conduct "involves an element of judgment or choice," in the sense that no "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Sanchez*, 671 F.3d at 93.

Where, as here, the conduct involved discretion, the second prong of the discretionary function exception asks whether "'the exercise or non-exercise of the granted discretion is actually or potentially affected by' legitimate 'policy-related judgments.'" *Reyes-Colon*, 974 F.3d at 59 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "[T]he 'or potentially'" language "means the

---

[32] The court previously held, at the motion to dismiss stage, that Plaintiff's theory of liability based on the initial "decision to land the helicopter and train at the Albert Farms Airfield" was barred by the discretionary function immunity, because "the decision where and when to conduct the training is susceptible to weighing various considerations related to combat-readiness." (Dkt. No. 44.) However, the court held the subsequent decisions to do nothing "after encountering snowmobilers actively using a trail traversing the unused air strip" was not susceptible to policy-related analysis. (*Id.*)

complained-of 'acts or omissions' need only be 'susceptible to a policy-driven analysis,' regardless of whether they actually were." *Id.* (quoting *Evans*, 876 F.3d at 383); *see Sanchez*, 671 F.3d at 93 ("Conduct is susceptible to policy analysis if 'some plausible policy justification could have undergirded the challenged conduct"; it is not relevant whether the conduct was 'the end product of a policy-driven analysis.'" (quoting *Shansky v. United States,* 164 F.3d 688, 692 (1st Cir.1999))). In addition, there is a presumption that a government official's discretionary decisions "are susceptible to policy analysis and thus protected." *Hajdusek v. United States*, 895 F.3d 146, 150 (1st Cir. 2018); *see Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021). On the other hand, because "[v]irtually any government action can be traced back to a policy decision of some kind, . . . an attenuated tie is not enough to show that conduct is grounded in policy." *Shansky*, 164 F.3d at 693.

The government argues, as it has throughout this litigation, that the conduct at issue here was susceptible to policy analysis. The court does not agree. The decisions to leave the helicopter directly on the obvious and actively used snowmobile trail near dusk without suspending or shortening the training plan and/or taking any mitigating precautions to alert approaching snowmobilers were neither based on policy-driven analysis nor susceptible to policy analysis. Instead, in the court's view, these were the types of decisions that did not "involve[] the permissible exercise of policy judgment," *Berkovitz*, 486 U.S. at 537,  but, rather, "involve[d] only garden-variety remedial measures," *S.R.P. ex. rel. Abunabba v. United States*, 676 F.3d 329, 340 (3d Cir. 2012).

The Supreme Court has explained that its earlier decision in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 (1955), "illuminates the appropriate scope of the discretionary function exception." *Berkovitz*, 486 U.S. at n.3.

> The plaintiff in [*Indian Towing Co.*] sued the government for failing to maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. . . . The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to Suit under the FTCA. . . . The latter course of conduct did not involve any permissible exercise of policy judgment.

*Id.* (citations omitted). In another example, the Supreme Court explained that if a government agent "drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply," because "[a]lthough driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *United States v. Gaubert*, 499 U.S. 315, 323 n.7 (1991).

Here, the crew's decisions to do nothing in the face of obvious hazards became more dangerous after quickly realizing they were landing directly on a trail and snowmobilers were using it. The danger increased with each passing minute as darkness increased. The decisions were not grounded in any overarching policy and did not implicate competing policy considerations. *See Oberson v. United States*, 311 F. Supp. 2d 917, 956 (D. Mont. 2004) (explaining, in case involving a snowmobile accident, that "[t]he government's failure to warn of the hazardous hill was not a decision grounded in public policy concerns and did not involve 'competing policy considerations.' It was simply an oversight, and therefore not insulated from review under the discretion function exception of the FTCA."), *aff'd*, 514 F.3d 989 (9th Cir. 2008); *see also S.R.P.*, 676 F.3d at 340 ("[W]here the Government is aware of a specific risk of harm, and eliminating the danger would not implicate policy but would involve only garden-variety remedial measures, the discretionary function exception does not apply."). The lack of judgment here was driven by the overriding goal of keeping the social plans unaltered.

The government argues that "the decisions whether to illuminate or warn about the aircraft on the airfield were necessarily susceptible to policy analysis" because they entailed weighing the risks and benefits of certain actions, like running the APU (which powers the helicopter's exterior lights). (Dkt. No. 202 at 50.) Arguably, the decision not to start the APU earlier was susceptible to policy analysis, in that it could have involved the weighing of considerations regarding the depletion of fuel supply. But, as the court explained at summary judgment, this was "not the only option[]"

available. (Dkt. No. 90.) One of the crew members could have been stationed in front of the helicopter with a headlamp shining to signal any snowmobilers traveling up the trail, akin to a flagger at a roadside worksite. In fact, CW4 Foster testified he attempted to free his headlamp upon noticing Jeffrey's snowmobile traveling toward the helicopter, but he ran out of time. The crew also could have used chem-lights to mark the location of the helicopter by placing them in the ground near the aircraft, as was done after the accident.[33] Similarly, the crew could have sought assistance from local or state emergency services when they quickly realized they landed on an active snowmobile trail. None of these potential additional decisions to ameliorate the risk of the helicopter's presence on the trail were the type that can be said to be susceptible to policy-related analysis. *See Berkovitz*, 486 U.S. at 537 (explaining that the discretionary function exception, "properly construed, . . . protects only government actions and decision based on considerations of public policy"). Rather, they represent garden-variety, common-sense steps to guard against a highly probable risk of harm created by the government.

In addition, the crew could have departed the Albert Farms Airfield significantly earlier after learning they parked on an active snowmobile trail. In fact, CW4 Foster testified that the plan was to begin to prepare to depart around sunset, which was at 6:54 p.m. on the night of the accident. However, as of 7:07 p.m., the crew were still away from the helicopter and socializing with Bowles and his family in the parking area. (Pls' Ex. 124; Dkt. No. 155, Stip. No. 21.) The accident did not occur until approximately 7:30 p.m.—well after the crew would have departed had they begun preparing to do so at sunset or earlier. If the crew, in particular Foster, had been assessing the lighting conditions and taking action to eliminate or reduce the hazard, rather than focusing on the

---

[33] The court finds the testimony of CW4 Foster regarding the need to preserve the finite resource of these chem-lights was not credible; additionally, other crew members testified there were many chem-lights available during the mission and, in fact, many were used after the accident.

social gathering, the accident would have been avoided. Again, these actions and inactions were not policy-related judgments.

The court finds that the failure to take any precautions following sunset—after encountering numerous groups of snowmobilers traversing the trail on which the helicopter sat—"pass[es] a threshold of objective unreasonableness such that no reasonable observer would see [it] as susceptible to policy analysis." *Hajdusek v. United States*, 895 F.3d 146, 152 (1st Cir. 2018); *Shansky*, 164 F.3d at 695 ("[T]he government's invocation of a policy justification may be so far-fetched as to defy any plausible nexus between the challenged conduct and the asserted justification." (citing *Duke v. Department of Agric.*, 131 F.3d 1407, 1412 (10th Cir.1997))). This decision to do nothing, in the court's view, is one in which "the unreasonableness of the activity would be clearly apparent ex ante to any reasonable observer" and, thus, is not plausibly grounded in policy-driven analysis. *Hajdusek*, 895 F.3d at 152; *see Davallou*, 998 F.3d at 506.

The court recognizes that "federal courts are constrained not to interfere with the exercise of [policy-based] discretion by any agency, and that is particularly so in the running of military operations." *Sanchez*, 671 F.3d at 103. But it is clear that the accident, and the failure to take any mitigating steps, occurred while no active military training was taking place. Rather, at the time when mitigating precautions should have been taken, CW4 Foster and the crew were engaged in a pre-planned social gathering. No crew member was even paying attention to the expensive piece of sophisticated military equipment, as it was just left unattended on the trail and the picnic plans were unaffected. Granted, at the moment of impact, some crew members were gearing up and preparing to depart. However, Foster and other crew members were still mingling with Bowles and his family, and the APU was not turned on yet. As Staff Sergeant Rossi testified, the crew's duties begin "as soon as the APU starts" and "the training stop[s] when the APU stops." (Dkt. No. 187 at 113.)

Accordingly, the court concludes the discretionary function exception does not apply here because the failure to take any precautions was not grounded in any legitimate policy-based objective. The FTCA's waiver of sovereign immunity is therefore effective, and this court has subject matter jurisdiction over this action.

IV.    ULTIMATE FINDINGS OF FACT AND CONCLUSIONS OF LAW

On the merits, the court applies Massachusetts substantive law since the accident occurred in Massachusetts. *See* 28 U.S.C. § 1346(b)(1); *Pearson v. United States*, 905 F. Supp. 2d 400, 403 D. Mass. 1996).

A.    Jeffrey's Negligence Claim

To prevail on his negligence claim, Jeffrey "must prove that the defendant owed [him] a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." *Cracchiolo v. E. Fisheries, Inc.*, 740 F.3d 64, 69 (1st Cir. 2014) (quoting *Jupin v. Kask,* 447 Mass. 141, 849 N.E.2d 829, 834–35 (2006)); *see Creatini v. McHugh*, 164 N.E.3d 190, 193 (Mass. App. Ct. 2021). "Negligence is the failure to exercise that degree of care which a reasonable person would exercise in the circumstances." *Gomez v. United States*, 2021 WL 38278, at *3 (D. Mass. Jan. 5, 2021) (quoting *Guzman v. Pring-Wilson,* 963 N.E.2d 1196, 1198 (Mass. App. Ct. 2012)). The court finds Jeffrey has met his burden of proving, by a preponderance of the evidence, that the Army crew were negligent in leaving the camouflaged helicopter on top of an active snowmobile trail at night, without taking any steps to warn or otherwise ameliorate the risk of an accident.

First, the court concludes the Army crew owed Jeffrey a duty of reasonable care. "[A]s a general principle of [Massachusetts] tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others." *Jupin*, 849 N.E.2d at 835. However, "[a] precondition to this duty is . . . that the risk of harm to another be recognizable or foreseeable to the actor." *Id.* Accordingly, a

defendant generally "owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." *Id.* Here, it was entirely foreseeable, given the diminishing light, that snowmobilers using the trail on the Albert Farms Airfield could crash into the unlit, dark-colored helicopter. The Army crew knew about the snowmobilers as early as their "low pass" before landing and certainly after landing when they encountered numerous snowmobilers and could see the snowmobile tracks directly under the helicopter. Although those earlier snowmobilers traveled at low speeds, it was foreseeable that other snowmobilers might travel at higher speeds up the straightaway, presenting a significant and predictable risk of harm which increased as the light diminished.

Second, the court finds that the Army crew breached its duty of care in failing to take any steps to eliminate or guard against the obvious risk of a snowmobiler crashing into the helicopter. Instead, during the time when mitigating steps could and should have been taken—after sunset, when the light started to decrease—the crew were socializing, away from the helicopter, with CW4 Foster's friend Bowles and his family. In fact, another snowmobiler, Martin, almost struck the helicopter during this time. The crew's absence from the helicopter and surrounding area prevented Martin from warning them about the near-collision, which the court infers he would have done since he warned others at Liston's. The failure to adequately supervise the helicopter, after leaving it in a dangerous location, contributed to this preventable accident. The court finds CW4 Foster, who was responsible for the training mission, was distracted by his reunion with Bowles; when he should have been assessing and mitigating the risks posed by the helicopter's location, he was instead socializing and thus neglecting his duty of care.

Third, the court finds Jeffrey's injuries were caused by the breach. "Causation has traditionally involved two separate components: the defendant had to be both a factual cause (or 'cause in fact') and a legal cause of the harm," also known as "proximate cause." *Doull v. Foster*, 163

33

N.E.3d 976, 982–83 (Mass. 2021). "Generally, a defendant is a factual cause of a harm if the harm would not have occurred 'but for' the defendant's negligent conduct." *Id.* at 983. This requirement is satisfied here: in the absence of the crew's negligent conduct, Jeffrey would not have crashed into the helicopter. As to legal (or proximate) cause, "the harm must have been 'within the scope of the foreseeable risk arising from the negligent conduct.'" *Id.* (quoting *Leavitt v. Brockton Hosp., Inc.*, 907 N.E.2d 213, 219 (Mass. 2009)). Jeffrey has satisfied the legal cause requirement as well, as the harm he suffered from the collision was within the scope of foreseeable risk of the crew's negligent conduct. Again, the court finds the accident (and thus the harm) was entirely foreseeable.

B.     Comparative Negligence

The United States argues that even if it is found negligent, Jeffrey was contributorily negligent. Under Mass. Gen. Laws ch. 231, § 85,

> [c]ontributory negligence shall not bar recovery in any action by any person or legal representative to recover damages for negligence resulting in death or injury to person or property, if such negligence was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.

Mass. Gen. Laws ch. 231, § 85. "In determining by what amount the plaintiff's damages shall be diminished in such a case, the negligence of each plaintiff shall be compared to the total negligence of all persons against whom recovery is sought," with "[t]he combined total of the plaintiff's negligence taken together with" the negligence of the defendant equaling one hundred percent. *Id.* Accordingly, if Jeffrey is "found to be more than fifty percent at fault," he may not recover. *Shantigar*

*Found. v. Bear Mountain Builders*, 804 N.E.2d 324, 328 (Mass. 2004).[34] If, however, Jeffrey is found to be fifty percent or less at fault, his total recovery is reduced by that percentage.[35]

Just as the Army crew had a duty to use reasonable care to avoid harm to another, Jeffrey was "obligated to exercise reasonable care for his own safety." *Fisher v. United States*, 705 F. Supp. 2d 57, 72 (D. Mass. 2010) (citing *O'Sullivan v. Shaw*, 726 N.E.2d 951, 954 (Mass. 2000). By statute, Defendant bears the burden of proving that Jeffrey was negligent, and it is presumed that Jeffrey exercised reasonable care to avoid harm. Mass. Gen. Laws ch. 231, § 85; *see Fisher*, 705 F. Supp. 3d at 72. The court finds the United States has met its burden of proving that Jeffrey breached his duty to exercise reasonable care and, thus, was contributorily negligent.

First, as Jeffrey both testified at trial and admitted at his criminal plea hearing, he was speeding when he drove up the airfield. Jeffrey pushed his snowmobile's throttle down for around 5 seconds and reached at least 65 miles per hour. He did this despite knowing that a snowmobiler can outdrive his headlight at excess speeds, and that is exactly what occurred. By the time Jeffrey realized there was an obstruction in front of him, he was going too fast to safely turn, or successfully brake, to avoid it. Had he been traveling at a safer speed, it is likely that he could have avoided the accident or at least suffered less serious harm.

Second, Jeffrey was wearing tinted goggles when he sped up the airfield and struck the helicopter. These goggles blocked, to some degree, the little remaining ambient light available. As

---

[34] In performing the comparative negligence analysis, the court may only consider "the named parties who participate in the trial," and not co-defendants, such as Mr. Chase, who settled before trial. *Shantigar Found.*, 804 N.E.2d at 334. However, pursuant to Mass. Gen. Laws ch. 231B, § 4, a remaining Defendant—here, the United States—is "entitled to a setoff in the judgment equal to the settlement amount" paid by the settling joint tortfeasor. *Id.* at 332.

[35] Importantly, loss of consortium damages, for a spouse or child of an injured plaintiff, are not reduced by the percentage of fault of the plaintiff. *See, e.g., Morgan v. Lalumiere*, 493 N.E.2d 206, 212–13 (Mass. App. Ct. 1986) ("A loss of consortium or parental society claim in Massachusetts is viewed as a separate and distinct cause of action, independent of the claim of the injured spouse or parent, and, while the negligence of such spouse or parent reduces his own damages in proportion to his degree of fault, the consortium or parental society damages are not reduced in proportion to the injured spouse or parent's degree of fault."). Therefore, Anthony and C.S. will recover the full amount of their loss of consortium damages, offset only by the settlement with Chase. *See* Mass. Gen. Laws ch. 231B, § 4.

such, they contributed to Jeffrey's inability to see the helicopter until it was too late. As an experienced snowmobiler, Jeffrey should have realized that using tinted, rather than clear, googles at night was unsafe.

Third, Jeffrey had reason to believe that the helicopter was still located on the airfield, since he saw it earlier in the day while driving past it. In fact, he stopped at the southern end of the airfield, stood up on his footboards, pulled his goggles off, and shined his headlight up the runway to see if anything might be there. Given his prior knowledge of the helicopter's location, Jeffrey should have exercised more caution when driving up the runway. On the other hand, the fact that he pulled off his goggles and still could not locate the helicopter illustrates that the helicopter's dark color blended in with the forest and hills in the background. Thus, even after Jeffrey attempted to locate the helicopter, it remained essentially invisible until shortly before "the point of impact." (Dkt. No. 188 at 178.) Still, the fact that Jeffrey saw the helicopter in that location earlier warranted some degree of extra caution on Jeffrey's part, even after he failed to locate the helicopter (or anything else) from the far-end of the airstrip.

Fourth, Jeffrey was slightly impaired by the combined effects of alcohol, clonazepam, and buprenorphine. This impairment increased Jeffrey's reaction time and reduced his ability to detect the helicopter. Although the court does not find Jeffrey was severely impaired, his slight degree of impairment, in combination with the other factors, contributed to the accident.

In the end, the court must compare the relative negligence of both parties and assign a percentage of blame. This is a difficult task but one which juries, as factfinders, are charged with regularly. Although the court finds the government has shown Jeffrey was contributorily negligent, it has not demonstrated that he is more than 50% responsible for the accident. Rather, the court finds Jeffrey is 40% responsible, and the United States is 60% responsible. Primary responsibility for the accident resides with the Army crew, who created the dangerous condition and failed to take any

steps to warn about or alleviate it. While Jeffrey himself was negligent in taking undue risks, Martin's experience of narrowly missing the helicopter demonstrates just how difficult it was to detect the helicopter from the direction Jeffrey traveled. From that vantage point, the camouflaged helicopter blended in with the trees behind it until just before the snowmobiler was on top of the helicopter. Even when traveling at a lower speed and in significantly brighter conditions than Jeffrey did, Martin almost struck the helicopter. This risk of harm only increased as the light level diminished.

Both parties were at fault here. But in assigning a percentage of blame, the court finds the United States is more at-fault than Jeffrey. As Jeffrey is not more than 50% responsible for the accident, his recovery is not barred but, instead, will be reduced in proportion to his percentage of fault, or 40%. *See* Mass. Gen. Laws ch. 231, § 85.

C.     Jeffrey's Damages

Under Massachusetts law, "[t]he plaintiff has the burden of proving his damages 'with reasonable certainty.'" *Coady v. Wellfleet Marine Corp.*, 816 N.E.2d 124, 13132 (Mass. App. Ct. 2004) (quoting *Agoos Leather Cos. v. American & Foreign Ins. Co.*, 174 N.E.2d 652, 655 (Mass. 1961)). "Although mere speculation is insufficient, 'the amount of damages need not be proved with mathematical precision; the extent of damages often must be left to estimate and judgment.'" *Id.* (quoting *Our Lady of the Sea Corp. v. Borges*, 665 N.E.2d 128, 131 (Mass. App. Ct. 1996)). "Evidence that enables the [factfinder] to arrive at an approximate estimate of damages is sufficient," and "'[t]he fact that there may be an element of uncertainty as to the amount of damages does not bar their recovery.'" *Id.* (quoting *Stuart v. Brookline*, 587 N.E.2d 1384, 1387 (Mass. 1992)).

In general,

> the measure of damages in negligence for personal injury is fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

*Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 899 (Mass. 2009). Moreover, "a defendant must take his victim as he finds him, and is liable for all the consequences of his acts, even when the consequences combine with a pre-existing injury or condition to bring about a greater harm to the plaintiff." *Fisher*, 705 F. Supp. 2d at 72.

Here, the parties have stipulated that Jeffrey's past medical expenses, "as a result of the accident, total $1,617,684.44." (Dkt. No. 155, Stip. No. 18.) For future medical expenses, Jeffrey presented the testimony of Dr. Tracy Witty, a Doctor of Occupational Therapy and Certified Life Care Planner.[36] (Dkt. No. 201-1.) Dr. Witty developed a life care plan and conducted a functional capacity evaluation for Jeffrey, which entailed reviewing medical records, evaluating him in-person, and consulting with medical providers, among other steps. Dr Witty opined that the cost of future medical procedures and adaptive medical equipment is $426,390. Importantly, Dr. Witty did not include in this figure many future surgeries which Dr. Brown has recommended—namely, bariatric surgery, diaphragmatic plication, tendon transfers, and muscle transfers.[37] Accordingly, although Dr. Witty's figure includes expenses for some medications, including Adderall and Klonopin, which Jeffrey was taking even before the accident, her overall figure likely undercounts Jeffrey's future medical expenses, considering the additional procedures that have been recommended but which Dr. Witty did not consider. The court will therefore adopt the $426,390 figure proffered by Jeffrey for future medical expenses. Accordingly, the court finds Jeffrey's damages in the form of medical expenses—past and future—is $2,044,074.44.

---

[36] The court finds, under Rule 702 of the Federal Rules of Evidence, that Dr. Witty is sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that her overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

[37] Jeffrey has not requested that the court increase the future medical expenses figure provided by Dr. Witty but, instead, limits his request to $426,390. (Dkt. No. 198 at 7.)

The court next considers Jeffrey's lost income. The parties presented dueling expert economists on this issue: Dr. Harvey Rosen for Plaintiffs, and Dr. Stan Smith for Defendant.[38] Dr. Smith opined Jeffrey's total lost income, past and future, as a result of the accident is $383,476. Dr. Smith explained that this figure represents the difference between the present cash value of Jeffrey's pre-injury earning capacity ($1,641,571) and his post-injury earning capacity ($1,258,095), assuming Jeffrey worked until 62. However, Dr. Smith relied entirely upon the range of annual earnings provided by Defendant's vocational expert, Guy Hostetler,[39] in his report: approximately $91,000 each year pre-injury, and approximately $78,000 each year post-injury. But Mr. Hostetler testified that it was only "conceivable" Jeffrey could get back to $70,000 in annual earnings. (Dkt. No. 195 at 173.) The court finds Defendant's post-injury earning capacity figure of $1,258,095, which is based on annual earnings of $78,000, is too high in light of Jeffrey's physical limitations and his earnings history post-accident. On the other hand, the court finds Jeffrey is likely to work until age 64, rather than 62, so the court will adjust Defendant's post-injury earning capacity figure upward by $22,000 to account for these extra two years of post-injury earnings, consistent with Dr. Smith's testimony, resulting in an adjusted post-injury earning capacity figure of $1,280,095 (before reducing this amount below).

Dr. Rosen assumed Jeffrey's post-injury earning capacity was $0, other than the income he has already made post-accident ($166,236). Dr. Rosen explained that Jeffrey "hasn't earned anything and generated very little revenue in '22 and '23. So I have no reason to anticipate putting any future income for him based upon his -- what I understand is his disability." (Dkt. No. 188 at 225.) The

---

[38] The court finds, under Rule 702 of the Federal Rules of Evidence, that Dr. Rosen and Dr. Smith are sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that their overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

[39] The court finds, under Rule 702 of the Federal Rules of Evidence, that Mr. Hostetler is sufficiently qualified by knowledge, skill, experience, and education to provide expert testimony and that her overall testimony was sufficiently reliable and based on adequate facts and data to be admissible.

court finds Dr. Rosen's assumption of no post-injury earnings in the future is too low. Jeffrey currently works approximately 10 hours each week and, following additional surgeries and accommodations—such as using a one-handed keyboard and dictation software—he can be expected to somewhat increase his productivity and earnings. Although Jeffrey had losses in both 2022 and 2023, he earned $32,414 in 2019 (the year of the accident), $105,059 in 2021, and $28,763 in 2022.[40] The court will therefore reduce Dr. Smith's adjusted post-injury earning capacity figure by 60%, resulting in $512,038 in reasonably expected post-injury income.

As to pre-injury earning capacity, Dr. Rosen's "jumping off point for [his] calculations was [Jeffrey's] 2018 income of $134,394." (Dkt. No. 188 at 217.) Dr. Rosen explained that he looked at Jeffrey's earnings from 2014 to 2016, when he was working at a law firm; he skipped 2017, Jeffrey's first year opening his own practice; and he also considered 2018—the average annual earnings for those years was "just under $120,000." (Id.) After considering inflation, assuming Jeffrey would have worked until 64, and offsetting the $166,236 Jeffrey actually earned post-injury, Dr. Rosen opined that the present cash value of Jeffrey's pre-injury earnings is $2,661,026. Dr. Smith's pre-injury earning capacity figure of $1,641,571 is, again, based on Mr. Hostetler's figure of approximately $91,000 in annual earnings. Mr. Hostetler explained that the average annual wage for an attorney in this area is in the $140,000 to $150,000 range, and the median wage is $124,970. However, he also opined that Jeffrey's substance use disorder would be expected to negatively impact his earnings. The court finds Dr. Rosen's pre-injury earning capacity figure is more accurate than Dr. Smith's, as Jeffrey's pre-injury earning history is more in line with Dr. Rosen's figures. However, the court gives some weight to Mr. Hostetler's opinion regarding the negative of impact, in the long run, of alcohol abuse on earnings. The court will therefore reduce Dr. Rosen's pre-injury earning capacity figure by

---

[40] Both economists testified there will often be extreme fluctuations in income for solo practitioners from year to year. As Dr. Smith explained: "When people are in private practice, there can be highly uncertain external factors that create ups and downs in a person's income," including referral income from cases referred years earlier. (Dkt. No. 192 at 26.)

10% to account for the likely lost earnings stemming from Jeffrey's pre-existing alcohol abuse. This results in a pre-injury earning capacity figure of $2,394,923.40. The difference between $2,394,923.40 (pre-injury earning capacity) and $512,038 (post-injury earning capacity) is $1,882,885.40, representing the present cash value of Jeffrey's total lost income.

Lastly, as to pain and suffering, the court finds Jeffrey has endured immense physical and mental anguish as a result of the accident. Jeffrey has essentially no use of his left arm, which he described as "dead weight." (Dkt. No. 190 at 82.) He therefore cannot do many everyday tasks requiring two hands that are often taken for granted, such as dressing himself, carrying items, and cutting his own food. Jeffrey also has an altered gait which makes it difficult to walk and puts him at risk for additional falls in the future. His pulmonary capacity is significantly reduced, resulting in him becoming out of breath even after non-strenuous activities. In addition to the physical burdens and pain caused by these ailments, they have also resulted in mental pain and suffering which can be expected to last into the future. Every time Jeffrey falls or has to ask family members for assistance with simple tasks, he suffers mental pain in the form of embarrassment and indignity. As Jeffrey testified, his relationship with his parents is strained because he relies on them so much for assistance. Jeffrey also cannot do many of the activities he truly enjoyed, such as snowmobiling and golfing with friends, and he feels isolated and fell "into a deep depressive state." (*Id.* at 88.) There can be no doubt that Jeffrey's enjoyment of life has been significantly reduced as a result of the accident. Moreover, while some of Jeffrey's physical ailments can be expected to improve somewhat after additional medical procedures, Dr. Brown testified that any improved functioning "typically will fall off with age." (Dkt. No. 189 at 21.) It is difficult to quantify the amount of damages which will fairly compensate Jeffrey for the pain and suffering he has and will continue to endure as a result of the accident. Considering all the evidence, the court finds $2,500,000 is an appropriate amount of damages for Jeffrey's physical and mental pain and suffering.

After combining past and future medical expenses ($2,044,074.44), past and future lost income ($1,882,885.40), and past and future pain and suffering ($2,500,000), the court finds that Jeffrey's total damages caused by the accident is $6,426,959.84. This figure must be reduced by 40% to account for Jeffrey's contributory negligence, resulting in $3,856,175.90. *See* Mass. Gen. Laws ch. 231, § 85. In addition, the court must apply the statutory offset, Mass. Gen. Laws ch. 231B, § 4, to reduce this figure by the amount Jeffrey has received from the settling co-defendant, Mr. Chase. The parties stipulated that the settlement with Chase was for $550,000. Accordingly, after applying the statutory setoff, the court will award Jeffrey $3,306,175.90 in damages.

D.    Anthony's and C.S.'s Loss of Consortium Damages

The Massachusetts Supreme Judicial Court has "recognized that a minor child has a strong interest in her parent's society and that a child has a right to recover for loss of a parent's society resulting from a defendant's negligence," since "[a] 'child's need for parental love and nurture' is protected in this Commonwealth." *Barbosa v. Hopper Feeds, Inc.*, 537 N.E.2d 99, 104 (Mass. 1989) (quoting *Ferriter v. Daniel O'Connell's Sons,* 413 N.E.2d 690, 695 (Mass. 1980). "[I]n order to recover for loss of parental consortium, [a child] must establish a reasonable expectancy of a dependent relationship with the injured parent." *Blank v. United States*, 2021 WL 4026075, at *12 (D. Mass. Sept. 3, 2021) (quoting *Gottlin v. Graves*, 662 N.E.2d 711, 715 (Mass. App. Ct. 1996)). This dependent relationship is based on "the child's 'dependence on the injured parent for management of the child's needs and for emotional guidance and support rather than economic dependence on the injured parent.'" *Id.* (quoting *Gottlin*, 662 N.E.2d at 715). "The loss of a parent's love, care, companionship, and guidance can severely impact a child's development and have a major influence on a child's welfare and personality throughout life." *Limone v. United States*, 497 F. Supp. 2d 143, 246 (D. Mass. 2007) (quoting *Villareal v. Department of Transp.,* 774 P.2d 213, 217 (Ariz. 1989)).

Moreover, "[t]here is no requirement that a child live with the injured parent in order to recover for loss of consortium." *Id.* However, "because the child's claim 'is based upon dependence on the injured parent for management of the child's needs and for emotional guidance and support' a plaintiff cannot recover for loss of consortium in a parent that occurred while the plaintiff was an independent adult." *Limone v. United States*, 497 F. Supp. 2d 143, 246 (D. Mass. 2007) (quoting *Barbosa*, 537 N.E.2d at 104).

The court finds that C.S. and Anthony Smith are entitled to loss of parental consortium damages for the loss of society, support, and companionship that each suffered while they were minors following the accident. C.S., who was 13 years old when Jeffrey was injured, testified that her father was an active and involved parent before the accident who coached all of her and Anthony's sports teams. C.S. often relied on her father for advice and described him as her "best friend." (Dkt. No. 191 at 11.) C.S. testified that Jeffrey would "drive over an hour to come pick me up if I need[ed] him to," but she "didn't have that for . . . probably two years after" the accident because Jeffrey "couldn't drive for a while," and "just not having him there physically was very hard for a while." (*Id.* at 12.) C.S. also described visiting her father in the hospital shortly after the accident. She saw her father in pain with "blood coming from everywhere," and she ran out of the room, hysterical, because she "couldn't really handle that." (*Id.* at 14.) C.S. explained that "seeing someone that you love so much go through something like that and look like that, it was terrifying." (*Id.*) C.S. also testified that she was hospitalized for two months shortly before the trial; Jeffrey visited her once in a hospital in Springfield, but "he walked [in] and couldn't breathe" which "was horrifying to see because I'm the one who's in the hospital bed but he needs more help than me," and Jeffrey was unable to visit her at all after her transfer to a hospital in Boston. (*Id.* at 18.) However, C.S. also testified to Jeffrey's pre-existing alcohol abuse and his inability to stop even though she had encouraged him to do so.

43

Anthony, who was 15 years old at the time of accident, also testified to Jeffrey's alcohol abuse and its negative impact on their relationship. On the other hand, Anthony also explained that Jeffrey was a very involved father, who spent countless hours coaching and traveling with Anthony to games. Jeffrey and Anthony also bonded by snowmobiling and taking trips together. Anthony described seeing his father in the hospital after the accident: "[I]t just tore me up inside. Just like looking at him and knowing that everything that we had planned out for years to come just probably wasn't going to happen." (Dkt. No. 188 at 69.) Anthony explained that even after Jeffrey was out of the hospital, "it really ate me up inside to go see him," because his father "was just like a shadow of who he was before," and the situation changed from Jeffrey taking care of Anthony to Anthony taking care of Jeffrey. (*Id.* at 70.)

"Loss of consortium damages are 'notoriously difficult to quantify.'" *Blank*, 2021 WL 4026075, at *12 (quoting *Litif v. United States*, 682 F. Supp. 2d 60, 82 (D. Mass. 2010)). Moreover, "[i]t is fair to say that no extensive display of facts is required to demonstrate, in light of ordinary human experience, an emotional or psychological dependence by the child upon her [parent]." *Gottlin*, 662 N.E.2d at 715 (quoting *Barbosa*, 537 N.E.2d at 105). Given that Anthony is older than C.S. and thus was a minor for a shorter period of time than C.S. following the accident, the court finds he is entitled to a lesser amount of loss of consortium damages than her. The court finds $150,000 is an appropriate amount of damages for Anthony's loss of consortium, and $200,000 is an appropriate amount of damages for C.S.'s loss of consortium. Again, the court must apply the statutory offset, Mass. Gen. Laws ch. 231B, § 4, and reduce these figures by the amounts Anthony and C.S. have received from the settling co-defendant, Mr. Chase. The parties stipulated that both Anthony and C.S. received $50,000 from the settlement with Chase. Accordingly, after applying the statutory setoff, the court will award Anthony $100,000 in damages and will award C.S. $150,000.

V.    CONCLUSION

For these reasons, the court finds in favor of Plaintiffs and awards $3,306,175.90 in damages to Jeffrey Smith, $100,000 to Anthony Smith, and $150,000 to Kerry Smith, as next friend to C.S. The Clerk is directed to enter judgment accordingly, and this case may now be closed.

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge